**Mary N. FAGG, Plaintiff/Appellee,**

v.

**HUTCH MANUFACTURING COMPANY
and U.S. Insurance Group,
Defendants/Appellants.**

Supreme Court of Tennessee,
at Knoxville.

June 27, 1988.

Dan D. Rhea, Knoxville, for defendants/appellants.

Roy P. Neuenschwander, Knoxville, for plaintiff/appellee.

## OPINION

O'BRIEN, Justice.

This workers' compensation case has been appealed by the employer and its workers' compensation insurance carrier raising four (4) issues. There is no dispute that the plaintiff was an employee of Hutch Manufacturing Company and sustained a compensable injury growing out of and in the course of her employment.

Prior to proceeding with the first issue we note that two appeals were effected in this case docketed as No. 12 and No. 13. The first was an attempt to appeal the trial court's preliminary award of temporary total disability benefits under the provisions of Tennessee Civil Procedure Rule 54.02. This Rule provides for the entry of a final judgment, in an action where more than one claim for relief is present, prior to entry of a judgment adjudicating all the claims, rights and liabilities involved. The Rule requires an express determination by the court that there is no just reason for delay and express direction for the entry of the judgment. Such certification by the trial judge creates a final judgment appealable as of right under Rule 3 T.R.A.P. In the absence of such a direction and determination by the trial judge, the order is interlocutory and not subject to interim appeal. See *Fox v. Fox*, 657 S.W.2d 747, 749 (Tenn.1983). Although the judgment in reference to the payment of temporary total disability benefits was drafted by defendant's counsel with the intent to appeal, approved for entry by all counsel and signed by the Chancellor, he noted in his finding of fact at the conclusion of the case that the notice of appeal on this issue was premature because there was no final judgment. This is a rule which must be considered with care by court and counsel in its operation. The court indicated it was intended as a partial judgment. We find that it was an interlocutory order awarding temporary total disability benefits and we dismiss appeal No. 12 without deciding the issue raised in that case.

The first issue raised on appeal No. 13 involves the same matters and was considered by the trial court in his final finding of fact. After hearing all of the proof he concluded that plaintiff's temporary total disability terminated as of the date of a prior hearing on 5 June 1986.

The specific issue presented is whether a two-year delay in a physician's subjective realization that plaintiff's condition was chronic and not subject to further significant improvement, justifies an award of temporary total disability benefits for that two-year period?

The evidence in this case leaves much to be desired. However, the proof does show plaintiff's injury occurred on 7 May 1984. She received two payments of temporary total disability compensation, one for a four week payment and the other for two weeks. The last check was received on 20 June 1984. For some reason which does not appear in this record there never has been another payment of temporary total disability benefits. This case dragged on until 5 June 1986, due, at least in part, to the plaintiff's continued treatment by Dr. R.H. Duncan for subjective symptoms about which she complained. On that day a hearing was held to determine the degree of relief due in the way of payment of temporary total disability benefits. It appears from the record that shortly prior to that date original counsel for the plaintiff had withdrawn and trial counsel had undertaken the legal representation. After a hearing on the matter in which he considered the testimony of plaintiff that she could not work and had not improved significantly; the deposition of Dr. Dennis Coughlin and the deposition of Dr. R.H. Duncan, the trial court concluded that the evidence preponderated in favor of the plaintiff on the issue of temporary total disability. He held that benefits had accrued from 20 June 1984, the last date on which payment had been made, until such time as plaintiff was released to return to work or had achieved maximum improvement, neither of which had yet occurred.

On defendants' motion the trial court ordered a stay of proceedings to enforce the judgment for temporary total disability benefits pending appeal, upon defendant's providing a bond in the sum of $2,500 conditioned on the satisfaction of the judgment.

At the hearing on 5 June 1986 plaintiff testified, in pertinent part, that after she sustained her injury she was first treated by a Dr. Stimpson who was not only the company doctor but her personal physician. After a few days of outpatient therapy she was hospitalized where she received a number of testing procedures and was seen by Dr. Robert Finelli, a neurologist, as well as

Dr. Stimpson. She suffered a physical reaction from medication prescribed by Dr. Stimpson and paid a visit to Dr. Finelli. She re-entered the hospital suffering from gastroenteritis where she was treated by Dr. Hollis Duncan who remained her primary physician throughout the course of her continued medical treatment. During that interval she saw Dr. Dennis Coughlin three times. She described her condition as having a pain that crossed her lower back into her hips and down into her legs with a numbness that she experienced in her left leg to the extent that she had very little feeling. This condition created a problem even at night time and made it difficult to sleep. The pain became more severe with standing or walking and if she pushed beyond her limits it resulted in further hospitalization. When it became severe she would call her doctor because the medication he prescribed was not strong enough to handle it.

She testified on cross-examination that prior to her injury at work she had lost a son in an automobile accident. She became disappointed with Dr. Stimpson because he was treating her for schizophrenia. After Dr. Duncan began treating her for her back problems she went in August of 1984, with his approval, to see Dr. Dennis Coughlin, an orthopedic specialist. In September of 1985 a grandchild pulled on her arm which aggravated her back problem and resulted in another period of hospitalization on Dr. Duncan's orders. During this period of time she was also receiving psychiatric counseling for depression.

Dr. Dennis Coughlin testified by deposition that he saw plaintiff initially in August of 1984 with a complaint of back pain of three and one-half months duration. Her medical history indicated she had been admitted to Park West Hospital on 1 June 1984 where she had a myelogram and CT scan. She was seen in consultation by Dr. Finelli. She was readmitted to the hospital in July of 1984 for gastro intestinal problems. She was seen again in consultation by Dr. Finelli. She was referred to him by Dr. Duncan for further evaluation and treatment of her ongoing back symptoms. She complained primarily of pain in the lower back region which was not constant but increased with standing and walking. The pain traveled down into her hips and down the back side of both legs with more pain on the left than on the right. She had occasional numbness in both legs. On 17 August 1984 he made a physical examination. Examination of the upper back region showed some minimal tenderness in the upper back musculature. In the low back or lumbar area rather marked tenderness was noted. Bending motions were carried out poorly, with a little rounding of the back. No muscle spasm was noted. Examination of the legs showed no reflex or neurological change. Circulation and sensation in the legs was considered normal. The remainder of the orthopedic and general examination was normal. X-ray of the lumbar spine showed normal alignment with no evidence of fracture or arthritis. The oblique view showed no evidence of any other abnormality. There was evidence of a slight degree of post-menopausal osteporosis. The lumbar myelogram which she had received on 22 May revealed an anterior extra dural bulge between the fourth and fifth vertebrae, which was minimal, with no significant nerve sleeve defect. He reviewed the CT scan which was carried out in May. It was negative. There was also an epidural venogram completed in May which was reported as normal. The significance of the finding from the myelogram was that the patient did not have a ruptured disc. His diagnosis was strain of the back. It was his impression that she had received excellent, conservative management of her back injury by the physicians who had been attending her. The normal CT scan of the lower lumbar area, the normal epidural venogram, the myelogram, and the essentially normal physical examination brought him to the conclusion that surgical intervention was not indicated at the time or in the foreseeable future. He fitted her with a back support to see if it would give any relief of her symptoms. It was his opinion, from an orthopedic standpoint, that it would be safe for her to return to work if she desired to do so. He expressed some doubt that she

really wanted to go back to work. He concluded that the patient had some residual disability or physical impairment as a result of her back injury at work which he rated at approximately five (5%) percent to the body as a whole. He was of the opinion that any further treatment, observation, bed rest, or physical therapy would not significantly alter the outcome.

He saw the patient again on 9 October 1984. She continued to have pain in her back and legs which she told him went down to her knees. She was being treated by Dr. Duncan and taking medication for pain as well as muscle relaxers. She was wearing her back brace on occasion and her pain was about the same as it had been at the time of his prior examination. Examination showed she was able to move about ·in a satisfactory manner and was able to get onto and off the examining table. There was some tenderness in the lumbar or lower back area. Bending motions were carried out rather poorly with only a little rounding of the back. He did not detect any muscle spasm. Examination of the legs showed normal motion and function in the hip, knee, and ankle joints bilaterally. Additional x-rays of the lumbar spine were obtained which showed normal alignment and no evidence of a fracture. Oblique views showed no evidence of pedicle defect or other congenital or developmental abnormality. A comparison with the former x-ray films failed to show any change in the overall x-ray appearance of the lumbar spine. He discussed the situation with Mrs. Fagg and felt she might benefit from a caudal block. He did not feel she required surgical intervention at that time and her disability or impairment remained at the previously stated level of five (5%) percent to the body as a whole. He next saw the patient on 15 January 1986. She was still under the care of Dr. Duncan and was receiving some psychiatric treatment for her nerves at Overlook Hospital. She related to him that in September of 1985 she had suffered further pain in her back and was admitted to Park West Hospital under the care of Dr. Finelli. She received another myelogram and was told she had a bulging disc and a crack in one of the vertebrae. She noted some improvement with physical therapy treatment. She told him she continued to experience pain in her back and some numbness in her left leg which increased when she walked for any period of time. He noted on examination she moved about in a satisfactory manner and was able to get onto and off the examining table. She had some tenderness in the lower lumbar area. Bending motions were carried out stiffly, as before. No muscle spasm was noted. Examination of the legs was normal. There was no reflex or neurologic change. Circulation and sensation of the legs was normal. The remainder of the orthopedic and general examination ˋwas within normal limits. X-rays showed normal vertebral alignment. No evidence of fracture was noted. It was his impression that her overall condition was just about exactly as it was when he saw her and evaluated her in August of 1984. He had recommended in August that the claim should be settled because he did not feel that any further treatment, observation, bed rest or physical therapy would alter the outcome. He was still of the same opinion. His deposition was taken on 19 May 1986 and he was of the opinion that her impairment remained at five (5%) percent to the body as a whole. That she had received an excellent work-up in the evaluation from Dr. Finelli with whom he agreed that surgery was not required then or in the foreseeable future. He noted there was no need for the patient to return to the clinic because he had nothing further to offer her. He felt she should probably continue her treatment at Overlook Hospital.

Two depositions by Dr. Raphael Duncan were offered in evidence. The first was taken on 30 May 1986. He testified that he first examined Mrs. Fagg for her complaints of back pain on 31 July 1984. She had pain in both legs on straight leg raising at about 80 degrees. She complained of pain in her low back, both sides, to the touch. She could not stand or walk for any length of time and had been taking a narcotic-type medication for pain relief as well as a muscle relaxant. On 7 August 1984

she was still complaining of back pain which had extended down into both legs and into her heels. She felt okay sitting but could not stand or walk. He referred her back to Dr. Finelli. On 14 August 1984 he recommended she proceed with a consultation with Dr. Dennis Coughlin. He continued to see her at approximately two week intervals for her ongoing complaints of back pain. On 19 September 1985 she was hospitalized with a diagnosis of acute low back strain superimposed on chronic low back strain. She was again hospitalized in March 1986 with a recurrence of acute low back strain. His diagnosis on discharge was acute lumbosacral strain with probable nerve root irritation due to muscle spasm; chronic lumbosacral strain from an old injury. A lumbar myelogram showed a ventrally protruding disc between the fourth and fifth lumbar vertebrae. A protruding disc of this nature would cause pain in the leg. On 8 May 1986 when he last observed her she was still having back pain which seemed to be some better. She did not have quite as much numbness in her left thigh and leg. She still had residual paresthesia, which is an altered sensation in her left leg and thigh. He thought she was some better overall. He stated that on that day she had so much pain she could not function. "Based on the experience that we've seen previously with this type of thing, I would say she is going to have at least fifty percent total disability."

On cross-examination he testified that his diagnosis of the plaintiff was based primarily on subjective symptoms related to him by the patient. He had not observed any physiological disturbance with the plaintiff except the muscle spasms noted in his records and tenderness to touch. Based on his knowledge of the patient he would not recommend surgery.

The second deposition of Dr. Duncan was taken on 8 August 1986. Dr. Duncan noted from his records that he had seen the patient five times since 8 May 1986 and continued her treatment. He was of the opinion that she had attained maximum recovery from her injuries. It was his testimony that she had not improved and she was still at least fifty (50%) percent im-

paired, which in all probability was permanent. He could not make an exact reference in time for the date she had attained maximum recovery. She had reached a point where she had not made any progress toward getting better somewhere in May or June. There was no significant improvement in her condition since the first time he saw her in June or July of 1984. There was some questionable evidence on one of the CT scans indicating the possibility of nerve root compression indicated by the degree and distribution of her symptoms. The sensation and the pain suffered by Mrs. Fagg was concomitant with some nerve root compression or nerve root irritation, although there was nothing disclosed by the radiological studies sufficient to require surgery. There were no clear anatomic deficits revealed by the x-rays and CT scans which would explain the plaintiff's back pain. He agreed that her complaints from a physical standpoint seemed out of proportion to the physical symptoms objectively present, except for paresthesia on her left thigh and leg which he described as a change in sensation. The fifty (50%) percent permanent partial disability rating which he had assessed was not based upon the American Medical Association Guide to evaluation of permanent impairment.

■ Since this cause of action arose prior to 1 July 1985 appellate review is under the material evidence standard which precludes this Court from considering the preponderance of the evidence. *Alley v. Consolidation Coal Co.*, 699 S.W.2d 147, 148 (Tenn.1985).

■ However, we have read this record carefully, not once but several times, and can reach no other conclusion than that the Chancellor made an erroneous finding on the facts regarding the medical proof dealing with the extent and duration of the plaintiff's temporary total disability. In his 5 June 1986 finding that plaintiff's temporary total disability had continued from 20 June 1984 he referred to Dr. Duncan's first deposition and ruled as follows:

"Dr. Duncan relates plaintiff's problems to the work-related injury. He testified that she is 'going to have' at least a fifty percent (50%) permanent partial disability. He states unequivocally that the plaintiff has been unable to carry out the duties of her employment during the time he has been seeing and treating her. The evidence preponderates in favor of the plaintiff on the issue of temporary total disability. Benefits have accrued from June 20, 1984, the last date on which benefits were paid, until such time as plaintiff is released to go back to work or achieves maximum improvement, neither of which have accrued at this point."

In his findings of fact on 19 August 1986 the trial court's comments on the medical evidence is most revealing:

"Talking first of all about the medical evidence, the dispute as to the weight to be given to the testimony of Dr. Coughlin versus that of Dr. Duncan. First of all, as I recall, Dr. Coughlin didn't observe any sort of objective symptoms at all. He was basing his opinion merely upon subjective complaints of Mrs. Fagg and felt that she had a clinical or anatomical disability based upon the relating guide that he had of five percent, and I don't think there is any question from his testimony that Mrs. Fagg was able to go through the tests and test out to having substantially complete range of motion in her body, and that sort of thing. Dr. Duncan appears to be considering additional matters, matters that Dr. Coughlin says that he really, perhaps, did not take into consideration. And Dr. Duncan, of course, had the additional benefit of having observed some sort of objective symptoms during the course of his treatment and examinations of the plaintiff. Objective symptoms that Dr. Coughlin did not observe.... In that regard, before I go further, I would have to say that at the time of the last hearing in this matter, the court made a finding that this lady was temporarily and totally disabled, would have to find, however, that the date of the termination of the temporary total disability would be, after having read the most recent deposition of Dr. Duncan, which was Exhibit No. 6, that that condition terminated, or was terminated, on the date of the last hearing, which would have been June 5, 1986. The court had made a finding with regard to her condition prior to that date, and it would appear that from and after June 5, 1986, the temporary total disability benefits should cease as of that date."

These findings by the trial judge are diametrically opposed to the medical proof. Dr. Dennis Coughlin's testimony was based entirely on objective symptoms discovered on his examination of the plaintiff. On the other hand, in his deposition of 30 May 1986 Dr. Duncan testified that in the interval he had been treating the patient from the time he first saw her until the last time he saw her in May 1986 she was basically in the same condition she had been insofar as her ability to do things with the pain she suffered. He testified that his diagnosis of Mary Fagg was based primarily upon what she had told him of her problems as opposed to objective symptoms.

In his deposition taken on 8 August 1986 he testified that his final examination had been on July 24 and the plaintiff was continuing to have pain down the left side of her leg and that she probably had attained maximum recovery from her injuries. Based on his examination and her symptoms he was of the opinion she was still at least fifty percent (50%) impaired. His testimony was that he could not state an exact date when she had attained maximum recovery but she had reached a point where she had not really made any progress for getting any better or maybe gave the idea that she was not going to get any better, somewhere in May or June of 1986. He diagnosed plaintiff's condition as a chronic lumbar strain and expressed the opinion she had not attained any significant improvement since June or July 1984. He agreed that according to the x-rays and CT scans the plaintiff had no clear anatomic deficits to explain her back pain. He concluded his deposition with the affirmation that he had limited his review and evaluation of plaintiff to her physical complaints concerning her musculoskeletal system and

that his disability rating was based on what he observed.

■ It is obvious from the testimony of either or both of the treating physicians that there was no significant change in the physical condition of the plaintiff throughout the extended treatment followed by Dr. Duncan over a two-year period. The doctors agree that the plaintiff was actually suffering some degree of physical pain and that she attained some degree of permanent partial disability. They differ only on the amount. There is no basis for the Chancellor's conclusion that her condition of temporary total disability extended over the entire two-year period. Temporary total disability benefits are terminated either by the ability of the employee to return to work or by the attainment of maximum recovery from his injury. See *Anderson v. Dean Truck Line Inc.*, 682 S.W.2d 900, 902 (Tenn.1984). In *Roberson v. Loretto Casket Co.*, 722 S.W.2d 380, 383 (Tenn.1986) this Court recognized that the Workers' Compensation Act provides for four types of disability, each serving a specific compensation purpose:

> "Temporary total disability 'refers to the injured employee's condition while disabled to work by his injury and until he recovers as far as the nature of his injury permits ...' [*Redmond v. McMinn Co.*,] 209 Tenn. [463] at 468, 354 S.W.2d [435] at 437. 'Certainly there is a time when temporary total disability ends, and a determination can be made with reasonable certainty as to whether the condition of Petitioner would respond to further treatment or whether his disability is permanent.' ... (Citations omitted). T.C.A. § 50–6–207 (3)(A)(i) specifically provides that the injured employee shall receive compensation 'for the period of time during which he suffers temporary total disability on account of the injury,' and thus the purpose served by such benefits is to allow for
>> 'the healing period during which the employee is totally prevented from working. Under the rule ... the temporary total disability period is cut off when the workman has reached its (sic)

> maximum recovery, at which point either permanent total or permanent partial disability commences ...'
> *Gluck Bros. Inc. v. Coffey*, 222 Tenn. 6, 13–14, 431 S.W.2d 756, 759 (1968). Accordingly, temporary total disability benefits 'are terminated either by the ability to return to work or attainment of maximum recovery.' *Simpson v. Satterfield*, 564 S.W.2d 953, 955 (Tenn.1978)."

It would be appropriate for this Court to remand the case for the purpose of establishing the extent of the plaintiff's temporary total disability. *International Yarn Corp. v. Casson*, 541 S.W.2d 150 (Tenn. 1976). However, she was injured in the early part of May 1984. Except for the first six weeks of payments she has not received one dollar in compensation for her injury. A portion of her medical bills remain unpaid. We consider it obligatory on our part to take immediate action to reinstate compensation and conclude this matter.

■ Dr. Coughlin fixed plaintiff's date of maximum recovery as 17 August 1984. Although she was examined by him and Dr. Robert Finelli on several occasions and was subjected to numerous tests of various kinds there is absolutely no clinical evidence in this record of any change in her condition after that date. Dr. Coughlin made the same findings in a subsequent examination on 9 October 1984. Dr. Duncan, who continued the plaintiff's treatment on to the date of trial, testified unequivocally that there was no significant change in her condition during that period of time. We conclude that under the undisputed evidence that the latest possible date which can be determined as the date plaintiff achieved maximum medical recovery was 9 October 1984 when Dr. Coughlin reaffirmed his earlier assessment of her disability.

Defendants' complaint about Dr. Duncan's failure to comply with the American Medical Association's Guide for the evaluation of permanent impairment was, for all intents and purposes, waived on the basis of *White v. United Industrial Syndicate, et al*, 742 S.W.2d 635, 638 (Tenn.1987), in

which this Court held that the amendment to T.C.A. § 50–6–204, requiring the use of the foregoing guide for the evaluation of permanent impairment, applies only to causes of action arising after 1 July 1985. This case does not fall under the mandate of the amendment.

Defendants take issue with the trial court's award of permanent partial disability of sixty-five percent (65%) to the body as a whole, contending the court relied to some extent upon Dr. Duncan's evaluation of fifty percent (50%) permanent partial disability. The principal argument is that Dr. Duncan's rating was ten-fold greater than the evaluation of Dr. Coughlin who placed her permanent partial disability at five percent (5%). The simple answer to that is to be found in our case of *Redmond v. McMinn County*, 354 S.W.2d 435, 209 Tenn. 463 (1962) in which the Court stated:

> "It should be noted there is a difference between the legal, and the medical concepts of disability under workers' compensation statutes; the one means inability to work or earn wages; and the other, inability in a physical or clinical sense..."

As the court noted in *Bennett v. Howard Johnson's Motor Lodge*, 714 S.W.2d 273, 279 (Tenn.1986), citing appropriate authorities:

> "In determining the extent of a workman's disability from a job related injury, once permanent anatomical disability has been established by competent medical testimony, the trial judge must take into account other factors that have a bearing on the workman's ability to earn wages on the open market, such as skills, education, training, duration of disability, and job opportunities for the disabled."

In this case the Chancellor found in fixing the degree of permanent partial disability that one of the doctors considered matters that the other did not. Both recognized plaintiff's problems were genuine and the court considered all the evidence not just the testimony of the physicians. He took into consideration the debilitating effect of pain on the ability of plaintiff to work and earn wages. He considered the fact that the recurring pain limited her ability to do ordinary things both at home and in her ability to hold a job. He considered plaintiff's work experience and her testimony as well as that of her witnesses in setting the proper percentage of permanent partial disability appropriate under the circumstances. We concur in his findings.

Defendants make a complaint about the indefinite character of the trial court's order in relation to the payment of medical expenses. Since this case is to be remanded the Chancellor will have the opportunity to make a more explicit allocation of medical expenses on rehearing if such be necessary.

Defendants complain of a six percent (6%) penalty imposed by the trial court on the unpaid workers' compensation installments. The court specifically held that it could find no just reason or excuse for the defendant's failure to pay the benefits promptly when they were due. Defendants now claim there was no evidence of bad faith on their part and there was nothing in the pleadings or the proof to support the court's findings.

T.C.A. § 50–6–205(b) specifically provides than any employer or his insurance carrier who fails to pay compensation as provided shall suffer a penalty of six percent (6%) on any unpaid installments. This Court held in *Mayes v. Genesco Inc.*, 510 S.W.2d 882, 885 (Tenn.1974) that, "the words in the Statute 'should suffer a penalty' to us implies that the failure to pay must be in bad faith on the part of the defendant ..."

These defendants paid six weeks of compensation after the plaintiff's injury and then, insofar as this record demonstrates, arbitrarily stopped any further payments. The plaintiff has not received another installment of compensation although more than four years have elapsed. This is an obvious, demonstration of bad faith and we hold that plaintiff is entitled to the six percent (6%) penalty on all benefits due from the date of the last payment of benefits until such time as payments are reinstated.

In summary we hold that plaintiff is entitled to temporary total disability benefits from the date of her injury until 9 October 1984. She is entitled to permanent partial disability benefits beginning as of that date in accordance with the trial court's judgment fixing her permanent partial disability at sixty-five percent (65%) to the body as a whole. A penalty of six percent (6%) on all unpaid installments is assessed against the defendants until such time as benefits are reinstated. The case is remanded to the trial court for an explicit allocation of medical expenses and for the payment of costs. Costs of this appeal are assessed against the appellants.

HARBISON, C.J., and FONES, COOPER and DROWOTA, JJ., concur.