**BAYBERRY ASSOCIATES,**
**Plaintiffs–Appellees,**

v.

**R. Lewis JONES, George Cate, Jr., James Gregoric, Robert McCullough, and Bedford Chapin, Defendants–Appellants.**

**Richard N. DOYLE, Plaintiff–Appellee,**

v.

**R. Lewis JONES, George Cate, Jr., James Gregoric, Robert McCullough, and Bedford Chapin, Defendants–Appellants.**

**Richard SURGENT, Plaintiff–Appellee,**

v.

**R. Lewis JONES, George Cate, Jr., James Gregoric, Robert McCullough, and Bedford Chapin, Defendants–Appellants.**

Supreme Court of Tennessee,
at Nashville.

Jan. 22, 1990.

John L. Chambers, Stokes & Bartholo-mew, P.A., Nashville, L. Joseph Loveland, M. Robert Thornton, King and Spalding, Atlanta, Ga., for defendants-appellants.

Steven A. Riley, Robert E. Cooper, Jr., Tim K. Garrett, Bass, Berry and Sims, Nashville, Jonathan A. Plasse, Goodkind, Wechsler, Labaton and Rudoff, New York City, for plaintiffs-appellees.

## OPINION

SAMUEL L. LEWIS, Special Judge.

In these consolidated cases, this Court granted permission to appeal from the judgment of the Court of Appeals to address two issues: (1) Whether the defendants, R. Lewis Jones, George Cate, Jr., James Gregoric, Robert McCullough, and Bedford Chapin, as directors of Comdata Network, Inc., may be sued under Maryland law directly by the plaintiffs as shareholders of Comdata or must a suit be brought only as a shareholders' derivative suit on behalf of Comdata Network, Inc., and (2) assuming a direct action can be brought, whether the Chancellor erred in refusing to certify a class in Bayberry Associates (Bayberry) with Bayberry as class representative. As a part of the second issue, the parties were asked to address the question of whether the trial court's order denying class certification was appealable under Tenn.R.Civ.P. 54.02.

The facts pertinent to our inquiry are as follows:

Comdata Network, Inc. (Comdata) is a Maryland corporation whose principal place of business is in Nashville, Davidson County, Tennessee. At all relevant times, Comdata's common stock was listed on the New York Stock Exchange. As of 23 March 1987, Comdata had issued and had outstanding 19,040,384 shares of common stock and had 2,283 stockholders of record.

In October 1986, Comdata's Board of Directors authorized Drexel Burnham Lambert (Drexel) to approach other businesses that might be interested in acquiring Comdata or in participating in another type of business combination. Drexel contacted approximately ninety entities over the ensuing three months. Proposals were received from three companies—Mason–Best, a limited partnership in the investment business; Welsh, Carson, Anderson & Stowe (Welsh–Carson), a New York limited partnership engaged in venture capital investing; and First Financial Management Corporation (FFMC), a computer service company located in Atlanta, Georgia.

Comdata's Board initially voted to pursue the Mason–Best proposal. When negotiations with Mason–Best reached an impasse on 4 March 1987, negotiations with Welsh–Carson and FFMC ensued.

On 23 March 1987, the Board met to reach a decision on the outstanding offers. The complaint alleges that FFMC offered a combination of cash and FFMC stock valued at $18 per share. The Board, however, accepted the Welsh–Carson proposal which would give each Comdata shareholder the option of receiving $16.50 cash per share or $10 cash plus a unit of securities of Comdata holdings in the new corporation to be formed in the merger.

Bayberry Associates is a limited partnership whose general partner is Mr. Charles Antell. Bayberry had owned 300,000 shares of Comdata since 30 July 1982. Mr. Antell personally owned 19,902 shares, all but two of which he purchased in the Fall of 1986 at $10–$11 per share.

Bayberry brought suit on 26 March 1987, three days after Comdata accepted the Welsh–Carson proposal. The complaint alleged that the directors of Comdata had wrongfully failed to obtain the highest price for shareholders, that they had failed to disclose material facts relating to the buyout, that certain defendants had acted out of self-interest in accepting a proposal that allowed them "to receive a substantial equity interest in and would continue as officers of the surviving corporation," and that, in order to preserve their positions and to receive these benefits, they had accepted an inferior offer.

Bayberry sought to enjoin the merger and also sought compensatory damages. Bayberry also sought to have the Court certify a class that would consist of "all stockholders of Comdata, and their successors in interest," excluding the defendant directors and persons or entities affiliated with the defendants.

The Comdata Board approved the merger in the 23 March 1987 meeting by a 5 to 2 vote. The five directors voting for the merger are the defendants. The two directors voting against the merger, Mr. Donald Carter and Mr. David Wilds, were not named as defendants.

Mr. Wilds is co-director of institutional sales at J.C. Bradford & Company in Nashville. J.C. Bradford was also advising FFMC in connection with its attempt to acquire Comdata and stood to make approximately 1.65 million had Comdata accepted the FFMC proposal.

Mr. Antell first purchased Comdata stock for Bayberry in 1979 through J.C. Bradford. At that time, J.C. Bradford made a market for Comdata stock. Mr. Antell has been in contact with the people at J.C. Bradford since 1979. He knew Mr. Wilds was a director of Comdata and knew J.C. Bradford was the investment banker for FFMC, although he denied knowing the details of J.C. Bradford's arrangement with FFMC in the Comdata deal.

Mr. Antell was displeased with the Board's action of 23 March rejecting what Mr. Antell characterized as a firm $18 offer for a $16.50 offer with loose ends. Between 23 March and 26 March, Mr. Antell talked with Mr. Wilds by telephone and expressed his displeasure. Mr. Wilds told Mr. Antell that the Board's vote had not been unanimous and that no vote had been taken on the FFMC proposal. This was information that was not public. He also gave Mr. Antell the telephone number of Pat Thomas, the head of FFMC. Mr. Antell called Mr. Thomas to express his displeasure. Mr. Thomas told Mr. Antell that he had received at least fifty calls of a similar nature from other Comdata share-

holders and that hopefully, FFMC would still try to do something.

Between 26 March and 9 April, Mr. Bob Dolittle of J.C. Bradford told Mr. Antell that FFMC intended to send Comdata a letter advising it of FFMC's continued interest.[1] Between 23 March and 9 April, Mr. Antell received information indicating to him that financing of the Welsh–Carson bid was shaky. It was public knowledge that Welsh–Carson had until 3 April in which to submit to Comdata indications of its ability to finance the transaction. Mr. Antell understood this condition as requiring a commitment, and he was informed by an unnamed source that Welsh–Carson had been talking with Drexel and Merrill–Lynch in an attempt to raise money, but that it had been unsuccessful.

When no announcement was made that Welsh–Carson had met the financing condition, Mr. Antell called Mr. Wilds and suggested that some public announcement be made. Mr. Antell then learned from someone else at J.C. Bradford that there would be a Board meeting on 9 April to discuss the financing.

Mr. Antell knew from Welsh–Carson's Securities and Exchange Commission filings that it intended to finance the purchase in part from Comdata's fee funds, i.e., excess cash held by Comdata that it was not required to hold to support deposits to meet capital requirements. Prior to 9 April, Mr. Antell learned from someone at J.C. Bradford that the fee funds might not be available. This presented another obstacle to the merger.

Sometime between 2 April and 9 April, Mr. Antell was informed by someone at J.C. Bradford that Welsh–Carson had only just begun its due diligence investigation. Mr. Antell became concerned that this was another obstacle and that in the course of the due diligence investigation Welsh–Carson might find something that would cause it to walk away from the deal, leaving the stock price to fall to $11 or $12. Mr. Antell

knew that FFMC already had most of the information needed for due diligence.

The information on FFMC's continuing interest, the letter of FFMC to the Comdata Board, the question raised concerning Welsh–Carson's due diligence, and the use of the fee funds were not made public knowledge.

On 9 April, the Board met. At 3:00 p.m., Mr. Antell read a press release from Comdata stating in part that Welsh–Carson had delivered to Comdata a letter from Drexel stating that it was "highly confident" that it could raise $235,000,000 in debt securities to finance the merger. Mr. Antell testified in his deposition that he did not regard the "highly confident" letter as a satisfactory financial commitment. Mr. Antell inferred that the Board was re-asserting its commitment to Welsh–Carson and would not accept what, in Mr. Antell's view, was the better offer of FFMC.

Within five minutes, he called his broker and sold 298,000 shares owned by Bayberry at $15.75, making a net profit of $2,100,000 on the sale. After this trade was confirmed, he sold 19,900 of his own shares, also at $15.75 per share. Mr. Antell testified that he sold because it was not worth waiting another month or two for $16.50 in the face of the risk that the deal might not go through and that this would result in a drop of the price of the stock to $11 or $12. He felt that holding the stock was not "in the interest of my partners."

On 18 May 1987, a hearing was had on the motion for class certification. At that time Bayberry had amended its complaint, deleting the request for injunctive relief and defining the class as Comdata shareholders, other than the defendants, as of the close of trading on 23 March 1987.

The Chancellor denied class certification but permitted Bayberry to proceed on its individual claims. On 26 June 1987, the Chancellor entered final judgment pursu-

---

1. Mr. Antell never saw the letter itself. The record contains a letter of 2 April 1987 from Pat Thomas to the Comdata Board thanking Comdata for its cooperation, expressing regrets that the merger attempt was not successful, pointing out

that FFMC did not and had not wished to pursue a merger without the Comdata Board's support, and concluded that FFMC remained interested if the pending merger agreement was abandoned. This letter was not made public.

ant to Tenn.R.Civ.P. 54.02 on the order denying class certification, and Bayberry's appeal began.

Plaintiffs Surgent and Doyle filed separate class action complaints on 15 July 1987. Both Surgent and Doyle are represented by the counsel representing Bayberry. Both seek to be named class representatives. The class issue has not been determined in either the case of Richard M. Doyle or Richard Surgent. The Chancellor denied motions to dismiss for lack of standing in both of these cases, that is, he held that the actions could be brought individually as a direct action and that a derivative action was not required. A Tenn.R.App.P. 9 appeal from the order denying the motion to dismiss was granted.

In *Bayberry Associates,* the Court of Appeals vacated the Chancellor's order denying class certification. However, that opinion did not order that Bayberry be certified as a class representative but remanded for further proceedings and noted the pendency of the class action request in *Surgent* and *Doyle.*

A different section of the Court of Appeals affirmed the Chancellor in *Doyle* and *Surgent.*

Before reaching the issues in this case, we must first determine whether we have jurisdiction of the *Bayberry Associates* appeal. In that action, the Chancellor, following an evidentiary hearing, entered an order denying class certification. Bayberry then filed an "Amended Motion" in which it sought to have the Chancellor either make the 5 June 1987 order denying class certification final pursuant to Tenn.R.Civ.P. 54.02 or grant an interlocutory appeal pursuant to Tenn.R.App.P. 9.

The trial court amended the 5 June order in pertinent part as follows: "It appearing

to the Court that there is no just reason for delay, and pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure, the Court expressly directs entry of this final order denying class certification...."

The trial court did not grant a Tenn.R. App.P. 9 interlocutory appeal.

■ An appeal as of right pursuant to Tenn.R.App.P. 3 lies from the trial court's entry of final judgment on orders adjudicating fewer than all claims or parties pursuant to Tenn.R.Civ.P. 54.02. *Nance by Nance v. Westside Hospital,* 750 S.W.2d 740 (Tenn.1988). Therefore, the first question in *Bayberry Associates* is whether the entry of final judgment pursuant to Tenn. R.Civ.P. 54.02 was proper when class certification was denied but the putative class representative was permitted to pursue its individual claim. In other words, did the order denying class certification adjudicate the claims of any parties as is minimumly required by Rule 54.02?

The appellate courts of Tennessee have not specifically addressed the appealability under Rule 54.02 of denials of class certification.[2]

In the context of the issue here, Tenn.Rs. Civ.P. 23 and 54.02 are identical in all respects to Fed.Rs.Civ.P. 23 and 54(b). Therefore, the opinions of federal courts are persuasive authority in this area. *Bowman v. Henard,* 547 S.W.2d 527, 530 (Tenn. 1977).

While it does not involve Rule 54, we begin our analysis of the federal law with *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978), a case which dealt expressly with whether the denial of class certification was properly appealable under the "death knell" doctrine. In *Coopers,* the Supreme Court stated that orders refusing to certify a class or

---

**2.** Tennessee appellate courts have found Tenn. R.Civ.P. 54.02 certification by trial courts to be improper when the certification was not of an order that could properly be viewed as a final judgment. *Fagg v. Hutch Mfg. Co.,* 755 S.W.2d 446, 447 (Tenn.1988) (Order held interlocutory and not appealable despite Rule 54.02 certification); *Mosier v. Mosier,* 1989 WL 22832 (Tenn. App. at Jackson, filed March 17, 1989) (Order to certify partial division of marital property as

final order under Rule 54.02); *Williams v. New York Times Broadcasting Servs., Inc.,* 1988 WL 27257 (Tenn.App. at Jackson, filed March 23, 1988) (Trial court's decision not to instruct jury on punative damages cannot be made a final order pursuant to Rule 54.02.); *Boston v. Memphis Aro Corp.,* (Tenn.App. at Jackson, filed September 17, 1985) (Items of damages "cannot be made final pursuant to Tenn.R.Civ.P. 54.02").

orders decertifying a class were "inherently interlocutory." 437 U.S. at 470, 98 S.Ct. 2459. The Court further stated: "It is undisputed that allowing an appeal from such an order in the ordinary case would run 'directly contrary to the policy of the final judgment rule embodied in 28 U.S.C. § 1291 and the sound reasons for it....' " Id. at 471, 98 S.Ct. at 2459 (footnote omitted). The Court quoted with approval from Judge Friendly's concurring opinion in Parkinson v. April Indus., Inc., 520 F.2d 650, 658–60 (2nd Cir.1975), in which he stated that the "best solution" was to allow appeals from decisions on class certifications "only under the procedure for interlocutory appeals provided by 28 U.S.C. § 1292(b)." 437 U.S. at 475–76 n. 27, 98 S.Ct. at 2462 n. 27.

In Minority Police Officers Assoc. v. City of South Bend, 721 F.2d 197 (7th Cir.1983), the District Judge refused to certify his order denying certification as a final judgment under Fed.R.Civ.P. 54(b). The Seventh Circuit, in affirming that decision, stated in part:

> The only reason the district judge refused to certify this lawsuit as a class action was that he thought the members of the class too few to satisfy the requirements of Rule 23. Their claims are identical to those of the named plaintiffs. In any event, the Supreme Court's decision that refusals to certify actions as class actions are not appealable under the "collateral order" doctrine, Coopers & Lybrand v. Livesay, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978), implies that they are not appealable under Rule 54(b) either. The argument for appeal that the Court rejected.was that such a refusal was sufficiently final as a practical matter to be a "final decision" within the meaning of 28 U.S.C. § 1291 interpreted in light of the "collateral order" doctrine. Since a federal rule of civil procedure cannot enlarge the jurisdiction of the district court (Fed.R.Civ.P. 82), Rule 54(b) only allows appeals from orders that are in some sense final. See, e.g., Western Geophysical Co. of America v. Bolt Assocs., 463 F.2d 101, 102–03 (2nd Cir.1972). And since Livesay holds

that refusals to certify a case as a class action are not final, they cannot be appealed under Rule 54(b) any more than they can be appealed under section 1291 directly.

Id. at 201.

In Snowden v. Baltimore Gas & Elec., 300 Md. 555, 479 A.2d 1329 (1984), the Maryland Court of Appeals followed the federal court in applying Maryland law and quoted with approval the foregoing language from Minority Policy Officers Assoc. See Snowden, 300 Md. at 564, 479 A.2d at 1334.

Snowden is persuasive but is not controlling. Although the substantive law in this case is governed by the law of Maryland, this is a procedural question and is controlled by Tennessee law.

In this case there are at least two reasons that weigh against appealability under Tennessee Law. First: An order on certifying a class "may be conditional and may be altered or amended before the decision on the merits." Tenn.R.Civ.P. 23.03(1). An order on certifying a class, by its very nature, cannot be made final when the named plaintiff is permitted to proceed on the individual action.

Second: An order made final pursuant to Tenn.R.Civ.P. 54.02 must be dispositive of an entire claim or party. Here, the putative class has never been made a party. Their claims were not properly before the trial court. Therefore, the "final judgment" entered by the trial court does not dispose of or adjudicate any claims of the class.

We have considered Bayberry's contention that even though the trial court "framed the order from which this appeal was taken to comply with Rule 54.02 and, therefore, did not follow the technical requirements of Rule 9," the opinion of the Court of Appeals indicates that the Court of Appeals accepted the appeal as a Rule 9 interlocutory appeal because that opinion states "we granted plaintiff's application for an interlocutory appeal to review the class certification."

We find nothing in the opinion of the Court of Appeals or in this record to buttress Bayberry's contention. We are of the opinion that the language in the Court of Appeals' opinion is mere inadvertence.

■ Unless an appeal from an interlocutory order is provided by the rules or by statute, appellate courts have jurisdiction over final judgments only. *Aetna Casualty & Surety Co. v. Miller*, 491 S.W.2d 85 (Tenn.1973). Tennessee Rule of Appellate Procedure 2 authorizes the suspension of all but Tenn.Rs.Civ.P. 4, 11 or 12. Therefore, we find no bar to the suspension of Rule 3(a). However, there must be a good reason for suspension and the record should affirmatively show that the rule has been suspended. Here, we are not persuaded that there is good reason, nor does the record show that the Court of Appeals intended to suspend Tenn.R. Appellate Procedure P. 3(a).

The trial court improperly entered a final judgment pursuant to Tenn.R.Civ.P. 54.02, and the Court of Appeals' opinion in *Bayberry Associates* should be vacated.

Tennessee Rule of Appellate Procedure 9 interlocutory appeals were granted in the cases of Richard W. Doyle and Richard Surgent. Therefore, our holding in *Bayberry Associates* has no effect on either of these cases.

■ The issue in both *Doyle* and *Surgent* is whether under Maryland law a direct action can be brought against the defendant directors or must the present action be brought only as a shareholder derivative suit on behalf of the corporation.

First, we note that the parties do not contest that Maryland law is applicable in deciding whether plaintiffs may bring a direct action against the defendants.

Both parties rely on the case of *Waller v. Waller*, 187 Md. 185, 49 A.2d 449 (1946).

Defendants rely on the underlined portion of the following language from *Waller:*

It is a general rule that an action at law to recover damages for an injury to a corporation can be brought only in the name of the corporation itself acting through its directors, and not by an individual stockholder, though the injury may incidentally result in diminishing or destroying the value of the stock. The reason for this rule is that the cause of action for injury to the property of a corporation or for impairment or destruction of its business is in the corporation, and such an injury, although it may diminish the value of the capital stock, is not primarily or necessarily a damage to the stockholder, and hence the stockholder's derivative right can be asserted only through the corporation. The rule is advantageous not only because it avoids a multiplicity of suits by the various stockholders, but also because any damages so recovered will be available for the payment of debts of the corporation, and, if any surplus remains, for distribution to the stockholders in proportion to the number of shares held by each.

Generally, therefore, a stockholder cannot maintain an action at law against an officer or director of the corporation to recover damages for fraud, embezzlement, or other breach of trust which depreciated the capital stock or rendered it valueless. Where directors commit a breach of trust, they are liable to the corporation, not to its creditors or stockholders, and any damages recovered are assets of the corporation, and the equities of the creditors and stockholders are sought and obtained through the medium of the corporate entity.

*Waller*, 187 Md. at 189–90, 49 A.2d at 452 (citations omitted). Defendants contend that the plaintiffs' complaint is one which alleges an injury which has diminished the value of the shares of all stockholders. Defendants further contend that the main thrust of plaintiffs' complaint is that the defendants have committed a breach of trust in negotiating the sale of Comdata and that where "directors commit a breach of trust, they are liable to the corporation, not to the creditors or stockholders."

Plaintiffs contend that, although the directors breached a duty owing to the corporation, they also breached a duty owing

directly to the injured shareholders. Plaintiffs argue that the following language from *Waller* supports their right to bring a direct action against the directors.

> Unquestionably a stockholder may bring suit in his own name to recover damages from an officer of a corporation for acts which are violations of a duty arising from contract or otherwise and owing directly from the officer to the injured stockholder, though such acts are also violations of duty owing to the corporation.

*Id.* at 192, 49 A.2d at 453 (citations omitted).

While not directly addressing the direct/derivative issue, *Toner v. Baltimore Envelope Co.*, 304 Md. 256, 498 A.2d 642 (1985), holds that directors owe a fiduciary duty to the corporation and to the shareholder. *Id.* at 268, 498 A.2d at 648. However, such a holding does not settle the issue of whether a stockholder may bring a direct action.

As the Court in *Waller* stated:

> It is generally stated that directors occupy a fiduciary relation to the corporation and all its stockholders, but they are not trustees for the individual stockholders. The reason for this distinction is that in law the corporation has a separate existence as a distinct person, in which all the corporate property is vested and to which the directors are responsible for a strict and faithful discharge of their duty, but there is no legal privity or immediate connection between the directors and the individual stockholders.

*Waller* 187 Md. at 194, 49 A.2d at 454 (citations omitted). Without more, general language concerning fiduciary duty owed to shareholders by directors does not support a direct action. In fact, the foregoing language from *Waller* could be construed to mean that under Maryland law a shareholder may never bring a direct action against a director for a breach of fiduciary duty. This is the argument of the defendants. However, we are of the opinion that Maryland law does not support such a broad conclusion.

In *Cooperative Milk Serv., Inc. v. Hepner*, 198 Md. 104, 81 A.2d 219 (1951), the court held that "when majority stockholders use their voting power for their own benefit, for some ulterior purpose adverse to the interests of the corporation and its stockholders as such, they thereby become fiduciaries and violate their fiduciary obligations." *Id.* at 114, 81 A.2d at 224. In *Twenty Seven Trust v. Realty Growth Investors*, 533 F.Supp. 1028 (D.C.Md.1982), the court held that a minority shareholder had stated a claim under Maryland law for breach of a fiduciary duty based on allegations that the sole purpose of a squeeze-out merger was to deprive the minority of certain tax savings. *Id.* at 1039. The court further held that the minority could bring the claim solely on its own behalf. *Id.* at 1039 n. 22.

It follows that if dominant shareholders owe minority shareholders a duty not to abuse their power of control to the minority's detriment under certain circumstances, there are circumstances in which directors owe a duty directly to shareholders. *See, e.g., Singer v. Magnavox Co.*, 380 A.2d 969, 977 (Del.1977).

*Waller* provides little assistance in identifying the duty owed and the circumstances under which it arises. Clearly, under *Waller* there are certain breaches that injure only the corporation, *e.g.*, corporate waste. Likewise, there are instances where its shareholders may clearly bring a direct action for violation of personal rights, *e.g.*, the right to vote or the right to compel the payment of dividends to which they are entitled.

In defining or in identifying the duty and the circumstances under which it arises, both the parties and the Court of Appeals relied on general corporate law as well as Delaware law.

Delaware courts distinquish between derivative and direct suits on the basis of injury rather than duty. A shareholder can maintain a direct action only when he or she sustains a "special injury." *Elster v. American Airlines*, 34 Del.Ch. 94, 99, 100 A.2d 219, 222 (1953). That is, an injury distinct from that suffered by other share-

holders or a wrong involving a contractual right of a shareholder. *Lipton v. News Intern., plc,* 514 A.2d 1075, 1078 (Del. 1986). Wrongs involving contractual rights of a shareholder are such rights as the right to vote or the right of the majority shareholder to exert control over rights which exists independent of corporation rights. *Moran v. Household Intern., Inc.,* 490 A.2d 1059, 1070 (Del.Ch.1985). "[M]ismanagement which depresses the value of stock is a wrong to the corporation; *i.e.,* the stockholders collectively, to be enforced by a derivative action." *Bokat v. Getty Oil Co.,* 262 A.2d 246, 249 (1970) (citing 3 Fletcher, *Corporations* § 1282 (Perm.Ed.)).

In determining whether a direct action lies, courts look to the nature of the wrong alleged. *Elster,* 34 Del.Ch. at 102–03, 100 A.2d at 223–24. Here, the plaintiffs have challenged the actions of defendant directors on several grounds.

First, they insist that, once it becomes apparent that a corporation is on the auction block, it is the duty of its directors "to see that the shareholders obtain the best possible price for their stock." *Edelman v. Fruehauf Corp.,* 798 F.2d 882, 886–87 (6th Cir.1986). "The directors' role change[s] from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company." *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 182 (Del.1986). This duty arises only if the sale of the corporation is inevitable. *Ivanhoe Partners v. Newmont Mining Corp.,* 535 A.2d 1334, 1345 (Del.1987).

While the record in this case is still at the preliminary stage, it does contain allegations, as well as evidence, that the sale of Comdata was inevitable with the only question being the identity of the acquiring company and terms and conditions of the sale. There is, therefore, evidence in the record supporting the existence of the duty of the directors to get "the best price for the stockholders at a sale of the company." *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d at 182.

Second, plaintiffs allege that the merger was unfair to them. As a part of this contention, they allege that the defendants engaged in self-dealing in accepting the Welsh–Carson offer by receiving equity interests and other benefits in connection with it. They also allege that the defendants failed to disclose these benefits.

In *Homer v. Crown Cork & Seal Co.,* 155 Md. 66, 141 A. 425 (1928), a minority shareholder alleged that the price offered shareholders in the sale of all of a corporation's property and assets was "grossly inadequate" and "fraudulent" and sought to enjoin the sale. The court held that equity would provide relief for fraud committed by a majority of the officers or directors in control. However, the court found the allegations of fraud to be nothing more than debatable issues of valuation and, because Maryland has a statutory appraisal remedy giving the shareholders a right to fair value for their stock, held that the complaint failed to state a claim for equitable relief.

There have been considerable developments in recent times regarding the fairness doctrine. Maryland cases addressing the issue have been responding in great part to developments in Delaware case law. In both Maryland and Delaware, the issue of fairness has arisen in the context of statutory appraisal remedies. The courts have been faced with the question of under what circumstances may a plaintiff obtain equitable relief outside the appraisal statutes, including equitable monetary relief against officers, directors, and majority shareholders for a breach of fiduciary duty.

An appraisal proceeding is a limited legislative remedy intended to provide shareholders who are dissenting from a merger on the grounds of inadequacy of price with a judicial determination of a fair value of their stock. *Cede & Co. v. Technicolor, Inc.,* 542 A.2d 1182, 1186 (Del.1988). However, this remedy is not exclusive. In *Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del.1983), the court held that the appraisal remedy might not be adequate "particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved." *Id.* at 714. Appraisal reme-

dies are limited to valuation and do not address wrongdoing. The focal point in an equitable action is the entire fairness, including fair price and fair dealing. *Id.*

In *Walter J. Schloss Assocs. v. C & O Ry.*, 73 Md.App. 727, 536 A.2d 147 (1988), the plaintiff, who was a minority shareholder of a subsidiary merged into the parent company, first sought to enjoin the merger and then sought damages in excess of the fair value of its stock. *Id.* 536 A.2d at 151–52. Although the plaintiff had rights to fair value under the Maryland statutory appraisal law, the plaintiff contended, and the Maryland Court of Appeals agreed, that these rights were not exclusive and that Maryland law also permitted equitable relief. *Id.* 536 A.2d at 154. After discussing *Weinberger, Lerner v. Lerner,* 306 Md. 771, 511 A.2d 501 (1986), and *Rabkin v. Phillip A. Hunt Chemical Corp.,* 498 A.2d 1099 (Del.1985), the court concluded as follows:

> As to whether, and under what circumstances, a monetary remedy apart from payment of fair value and the statutory appraisal process is available, there does not seem to be a great deal of difference between established Maryland law and the principles enunciated in *Weinberger* and *Rabkin.* Such a remedy is available, if at all, under very limited circumstances, none of which are well-plead or in evidence here.

*Walter J. Schloss Assocs.,* 73 Md.App. 727, 747, 536 A.2d 147, 157.

In a recent Delaware Chancery case, the court stated:

> Defendants' primary argument in favor of dismissal is that the complaint states only derivative claims. They point out that similar claims, attacking the improvident grant of stock options, golden parachute employment agreements and other alleged mismanagement have been found to be derivative claims. *See, e.g., Penn Mart Realty Co. v. Perelman,* Del. Chan., Civil Action No. 8349, *Hartnett, V.C.* [1987 WL 10018] (April 15, 1987) (claims over severance payments are derivative); *Elster v. American Airlines,* Del.Ch., 100 A.2d 219, 222 (1953) (claims

challenging the grant of stock options are derivative). The fact that similar claims are raised here in the context of a merger does not transform those claims from being derivative to direct.

> Defendants' position would be well founded if this Court were able to conclude that the complaint does not directly attack the merger. In *Kramer v. Western Pacific Indus.,* Del.Supr., 546 A.2d 348 (1988), a former stockholder was held to have no standing following a cash-out merger to pursue claims of mismanagement. Plaintiff had argued that the alleged wrongs (excessive stock options, fees and termination bonuses) directly affected the price paid in the merger and that, as a result, the complaint should be read as a direct attack on the fairness of the merger terms. Although the Court found otherwise, it recognized that direct attacks on corporate restructurings may be maintained even after the transaction has been completed.

> As recognized by this Court in [*Cede & Co. v. Technicolor, Inc.,* Del.Supr., 542 A.2d 1182 (1988)], direct attacks against a given corporate transaction (attacks involving fair dealing or fair price) give complaining shareholders standing to pursue individual actions even after they are cashed out through the effectuation of a merger. Specifically, this Court stated that "[n]o one would assert that a former owner suing for loss of property through deception or fraud has lost standing to right the wrong that arguably caused the owner to relinquish ownership or possession of the property." [citation omitted]. *Id.* at 354. The complaint here, unlike the one in *Kramer,* does directly attack the Western/Delta merger. Plaintiffs claim that the merger consideration was grossly inadequate ...; that the allegedly inadequate price resulted from the Western directors' failure to "shop" the company and their grant of the stock option to Delta ...; and that defendants solicited approval of the merger without full disclosure of certain facts relating to the value of the company.... These allegations, if they state a claim at all, constitute direct at-

tacks on the validity of the merger and, thus, cannot be dismissed for lack of standing in light of the consummation of the merger.

*Rand v. Western Airlines, Inc.*, No. 8632, 1989 WL 104933 (Del.Ch. Sept. 11, 1989).

The allegations in the complaints of Doyle and Surgent constitute direct attacks on the validity of the merger. Their complaints allege that defendants violated their fiduciary duties to each of them and rejected the higher offer of FFMC in order to preserve their positions and receive substantial financial benefits. Plaintiffs, in accordance with *Weinberger* and *Walter J. Schloss Assocs.*, have stated a claim for relief on the allegations of self-dealing and/or acting in the interests of persons other than the shareholders.

Further, plaintiffs do not have a statutory appraisal remedy. Maryland law does not grant court ordered appraisal rights if the shares are traded on a national securities exchange such as the New York Stock Exchange. *Md. Corporations & Associations Code Ann.* § 3–202(c)(1) (1985).

It is not Comdata which would benefit from a recovery against the defendants. Comdata is to be merged out of existence. It is the shareholders alone who have been damaged and would benefit from the recovery.

It therefore results that the judgment of the Court of Appeals in *Bayberry Associates v. Jones* is vacated and remanded to the Chancery Court and the judgments of the Court of Appeals in *Doyle v. Jones* and *Surgent v. Jones* are affirmed and remanded for further necessary proceedings.

Costs in *Bayberry Associates* are taxed to the plaintiff–appellee and costs in *Doyle* and *Surgent* are taxed to the defendants-appellants.

DROWOTA, C.J., and FONES, HARBISON and O'BRIEN, JJ., concur.