# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 3, 2011 Session

## UNA P. IRVIN v. ERNEST J. IRVIN, II

**Direct Appeal from the Circuit Court for Montgomery County**
**No. MC-CC-CV-DV-09-0084      John H. Gasaway, III, Judge**

---

**No. M2010-01962-COA-R3-CV - Filed June 15, 2011**

---

This is a divorce case in which Husband/Appellant appeals the trial court's order. After a thorough review of the record, we conclude that the trial court's order is not final because it fails to address Husband's request concerning the sale of the marital residence. The order is also deficient in that it: (1) is ambiguous and fails to resolve certain conflicts between a mediation agreement and a stipulation entered by the parties; (2) fails to make the mandatory findings as required by Tennessee Rule of Civil Procedure 52.01, and specifically fails to properly value the marital property. We dismiss the appeal and remand for entry of a final judgment, which resolves the ambiguities and is otherwise compliant with Tennessee Rule of Civil Procedure 52.01.

**Tenn. R. App. P. 3. Appeal as of Right; Appeal Dismissed and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S, and HOLLY M. KIRBY, J., joined.

Donald N. Capparella, Nashville, Tennessee, for the appellant, Ernest J. Irvin, II.[1]

Lawrence J. Kamm and Stacey A. Turner, Nashville, Tennessee, for the appellee, Una P. Irvin.

## OPINION

Appellee Una P. Irvin ("Wife") and Appellant Ernest J. Irvin, II ("Husband") were married in Fayetteville, North Carolina, on December 28, 1999. Two children were born to the marriage; their respective dates of birth being September 28, 2001, and November 29, 2003. At the time of trial, Mr. Irvin was thirty-seven years old, and Ms. Irvin was thirty-

---

[1] We note that Mr. Irvin was represented by Mr. Robert J. Martin at the trial of this matter.

three. Ms. Irvin graduated from East Carolina University in 2000 with a degree in family community services. Mr. Irvin has a degree in science and economics. He is a Major in the United States Army, and has over nineteen years' experience with the military. Mr. Irvin has been deployed many times during the course of the marriage, including five deployments to Iraq, two deployments to Afghanistan, and one deployment to Kosovo and Bosnia.

On January 21, 2009, after nine years of marriage, Ms. Irvin filed a complaint for divorce in the Circuit Court of Montgomery County. On January 23, 2009, Ms. Irvin filed a motion for contempt against Mr. Irvin, alleging that he had removed Ms. Irvin's name from the parties' joint checking and savings accounts in violation of the temporary injunction provided under Tennessee Code Annotated Section 36-4-106(d). On February 3, 2009, Mr. Irvin filed both his answer and counter-complaint for divorce as well as a response to the motion for contempt. There is no order in the appellate record indicating whether the trial court granted or denied Ms. Irvin's motion for contempt.[2]

After Ms. Irvin filed her complaint for divorce, the parties continued to live together in the marital residence. However, on February 19, 2009, Ms. Irvin filed a motion for exclusive possession of the marital residence. On the same day, Ms. Irvin filed her answer to Mr. Irvin's counter-complaint for divorce, along with a sworn income and expense statement. Mr. Irvin opposed the motion for exclusive possession of the marital residence and also filed his own income and expense statement.

Ms. Irvin's motion for exclusive possession of the marital residence was heard on February 26, 2009. Although the hearing was held on February 26, 2009, the order was not entered until December 7, 2009; no explanation is given in the record concerning the delay in entry of this order. The order grants Ms. Irvin the sum of $2,500.00 per month in temporary spousal support. However, the order states that no temporary parenting plan is needed because the parties and the children still reside in the marital residence. Ms. Irvin's motion for exclusive possession of the marital residence was denied based upon the court's findings that no physical violence had occurred and that the parties were able to occupy their separate spaces within the marital residence. Specifically, the trial court found that "counsel for both parties admit that no physical violence has taken place at this time, such that would warrant an order for exclusive possession of the marital residence." The court further found that the arrangement with Mr. Irvin living in the finished basement "worked well." Mr. Irvin was given one hour of uninterrupted time with the children per day.

According to the record, after the court denied her motion for exclusive possession

---

[2] No issue has been raised on appeal concerning the alleged contempt. However, our rulings herein do not preclude the trial court from re-visiting this issue on remand if necessary.

of the marital residence, Ms. Irvin told her father, Jess Thompson, that Mr. Irvin scared her, and that she was afraid he would "snap." Ms. Irvin's fears appear to be founded in her belief that other soldiers were returning from the war with "post-traumatic stress." Despite Ms. Irvin's concerns, as found by the trial court, there was no history of violence on the part of Mr. Irvin. Nonetheless, on March 19, 2009, Jess Thompson filed a Congressional Inquiry with United States Senator Saxby Chambliss's office, claiming that Mr. Irvin was "abusive to the point of perhaps killing [Ms. Irvin] and/or his children." As a result of these allegations, Mr. Irvin was presumptively removed from the marital home on March 24, 2009, by military order, until an investigation could be completed. Mr. Irvin's battalion commander escorted him from the marital home as a precautionary measure based upon a mandatory seventy-two hour no contact order. Although an investigation found no basis for the charges in the Congressional Inquiry, Mr. Irvin's commander suggested that he not return to the marital home in an effort to prevent further escalation of the situation. There is no proof in the record to indicate that Mr. Irvin suffers from post-traumatic stress disorder. Mr. Irvin was subsequently transferred by the Army to a new duty station in Alabama. Ms. Irvin stayed in Clarksville.

On March 13, 2009, Mr. Irvin filed a proposed permanent parenting plan seeking to be named as the children's primary residential parent. On March 31, 2009, Mr. Irvin filed a motion for injunction requesting that Ms. Irvin be enjoined and restrained from "continuing to make spurious allegations to the Husband's Chain of Command and/or Department of the Army." On March 31, 2009, Mr. Irvin also filed a motion to adopt his proposed temporary parenting plan pending the final hearing. Therein, Mr. Irvin sought to be named the children's primary residential parent, *pendente lite*, based upon Ms. Irvin's behavior. Specifically, Mr. Irvin alleged that Ms. Irvin had spoken badly about him in front of the children and had failed to encourage a relationship between Mr. Irvin and the children. Ms. Irvin opposed Mr. Irvin's motion and specifically refuted Mr. Irvin's allegations. On April 29, 2009, Ms. Irvin filed her proposed temporary parenting plan, in which she sought to be named primary residential parent and also alleged inappropriate behavior on Mr. Irvin's part. Specifically, Ms. Irvin asserted that Mr. Irvin was controlling to the point of abuse.

Based upon his allegations of inappropriate behavior, on May 11, 2009, Mr. Irvin moved the court to allow the minor children to be evaluated by an expert of his choosing. Ms. Irvin opposed this motion. These matters were heard on May 29, 2009. On June 29, 2009, the trial court entered its order on Mr. Irvin's motion for injunction, his motion to have the children evaluated, and his motion for entry of a temporary parenting plan. The June 29, 2009 order does not specifically grant or deny Mr. Irvin's motion for injunction. However, the order denies both his motion to have the children evaluated by his expert and his motion for adoption of his proposed temporary parenting plan. Instead, the order appoints Dr. Janie Berryman to independently evaluate the children and appoints Andrea Goble as guardian *ad*

*litem* for the children. The order further names Ms. Irvin as the children's primary residential parent, *pendente lite*, and sets visitation for Mr. Irvin. The June 29, 2009 order is sparse on findings of fact; however, the court does specifically state that:

> The Court has considered the relevant factors enumerated in [Tennessee Code Annotated Section] 36-4-404 and finds, for the most part, that the parties are equally weighted with regard to these factors. The Mother, however, has been the primary caregiver for the minor children for the majority of their li[ves] as Father has chosen, through his employment, to be away from his children the majority of their li[ves]. Additionally, the children have resided here in Clarksville for five years and the Court finds that it is not in their best interest to relocate with father to the state of Alabama at this time.... The Court finds that the Father should have access to the children at all reasonable times for visitation prior to his relocation to Alabama.

On July 31, 2009, the parties filed a mediator's report, which indicates that the parties had reached a partial agreement as to the property settlement but that they could not agree on a parenting plan. A Memorandum of Understanding (which is also referred to by the trial court and the parties as the "mediation agreement") was also filed with the trial court, along with a "Stipulation" indicating how the settlement should be implemented. There is dispute as to whether this "Stipulation" was properly entered into the record; we will discuss this issue more fully below. Other portions of the parties' settlement agreement later became the subject of contested post-trial proceedings. Specifically: (1) how Mr. Irvin's retirement account should be divided, and (2) whether Ms. Irvin breached the settlement agreement by not making timely mortgage payments. Both of these issues will also be discussed in more detail below.

A final hearing on the issues of alimony, child support, and the parenting plan was held on September 23, 24, and 28, 2009. Although the trial court made some findings from the bench following the close of all proof, a final decree was not entered until May 27, 2010. We note that the court's findings from the bench were not incorporated into this decree.

On March 26, 2010, Mr. Irvin filed a motion to enforce the memorandum of understanding and also moved the court to enter an order from the September 28, 2009 hearing. On March 30, 2010, Ms. Irvin filed her response to Mr. Irvin's motion. Attached to Ms. Irvin's motion was a copy of the document titled "Stipulation." There is no file stamp on this "Stipulation." In response, Mr. Irvin filed a notice of filing what purports to be a

transcript of a ruling made by Judge Gasaway at the hearing on September 28, 2009; however, we note that the proposed transcript is not certified by a court reporter. A hearing was held on April 5, 2010. At this hearing, the court made no ruling but set the case for further hearing, on April 27, 2010, to resolve any outstanding issues.

On April 16, 2010, Mr. Irvin filed a motion to clarify the record, requesting the court to mark, as "Exhibit A," the Congressional Inquiry, which was allegedly "considered and excluded by the court for reasons set forth in the transcript." This motion further states that: (1) "Counsel intended the Congressional Inquiry to be marked for identification purposes only for the record"; (2) "after the trial was over, Husband's counsel was given back the Congressional Inquiry by a courtroom officer"; (3) "Court had been adjourned"; and (4) "Counsel hereby requests that the Court mark the attached as an exhibit that the Court excluded from evidence."

At the April 27, 2010 hearing, the court ordered Mr. Irvin to pay Ms. Irvin the sum of $42,500.00 in cash, with 10% interest accruing from September 30, 2009. Concerning the motion to clarify, *vis a vis* the Congressional Inquiry, the transcript of the April 27, 2010 proceeding indicates that the court granted the motion from the bench and marked the Congressional Inquiry for identification purposes only; however, there is no order in the appellate record stating that the motion to clarify was granted.

Before a final order was entered, Ms. Irvin commenced an action in the General Sessions Court of Montgomery County. On May 5, 2010, Ms. Irvin obtained an order of protection against Mr. Irvin, pursuant to Tennessee Code Annotated Section 36-3-601, *et seq*. In seeking this order of protection, Ms. Irvin acted *ex parte* and without assistance of counsel, and no notice of the general sessions court proceedings was given to Mr. Irvin or his counsel. Moreover, it appears that Ms. Irvin did not inform the general sessions court of the pending divorce matter in the circuit court. Ultimately, the general sessions court found that Ms. Irvin had misled the court by obtaining the order of protection for the improper purpose of circumventing the rulings of the Circuit Court, which had awarded Mr. Irvin summer visitation with the children. Had the order of protection gone unchallenged, it would have prevented Mr. Irvin's summer visitation. Mr. Irvin moved the general sessions court to dismiss the order of protection, which had apparently been based upon Ms. Irvin's allegation that Mr. Irvin had choked the parties' six-year-old son during a visit in May 2009. At the hearing on Mr. Irvin's motion to dismiss the order of protection, evidence was adduced indicating that Ms. Irvin did not take the child to the doctor until the day after he returned from visitation with Mr. Irvin. The emergency physician's record indicates that the doctor observed "no visible marks" on the child and that domestic abuse was not indicated. The police and the Department of Children's Services were both notified; however, no action was taken. At the general sessions hearing, Ms. Irvin made new allegations of inappropriate

physical contact by Mr. Irvin concerning the parties' seven-year-old daughter. The general sessions judge ultimately found that the allegations of sexual abuse were unfounded, and specifically stated that "this is clearly a case of [Ms. Irvin] trying to use these children against [Mr. Irvin]."

Six days before the entry of the decree, Mr. Irvin filed an expedited motion to enforce the trial court's order with regard to his summer vacation, alleging that Ms. Irvin had obtained an *ex parte* order of protection "for the improper purpose of circumventing this Court's recent final decree of divorce." Ms. Irvin filed a *pro se* pleading in the trial court attempting to explain the *ex parte* order of protection. Therein, Ms. Irvin again asserts her belief that Mr. Irvin suffers from post-traumatic stress disorder and that he "will continue to hurt not only his children, [but also] myself given the chance," as well as "others around him." Again, no evidence was presented to indicate any propensity for violence on the part of Mr. Irvin.

A decree from the September 23, 24 and 28, 2009 and April 27, 2010 hearings was entered by Judge Gasaway on May 27, 2010. The order provides, in relevant part, as follows:

> [T]he Court finds as follows:
>
> 1. ...[T]hat Husband is guilty of inappropriate marital conduct and that in weighing his conduct against that alleged of the Wife, the Court finds that his conduct preceded and was more egregious and damaging to the marriage and therefore, the Husband's Petition for Divorce is dismissed and the Wife is awarded a divorce on grounds of inappropriate marital conduct.
>
> 2. That the Court adopts and incorporates the Memorandum of Understanding entered into between the parties in mediation dated July 28, 2009 (exhibit A) into this Final Decree as resolving, by agreement, many property issues between the parties.
>
> 3. That the Court considered the relative factors set out in T.C.A. 36-6-404 wherein the Court found that the majority of the factors listed weighed equally on the part of the Mother and Father with regard to determining a parenting plan, however, the Court finds that the Mother has been the primary caregiver for the minor children for the majority of their li[ves] and has exercised a greater responsibility for caring for the children's

daily needs due to the Father's numerous and lengthy deployments through his military service. Further, the court finds that these children have lived in Clarksville, Tennessee in a very stable and satisfactory environment for a significant period of their lives and that the Father will be moving at least one more time through his military service within a year of the date of the final decree. Considering all of the factors, the Court finds that the Wife, Una P. Irvin, should be the primary residential parent of the parties' minor chil[dren]....

4. That the parenting plan submitted by the Wife took into account more realistically than the parenting plan submitted by the Husband the day-to-day activities, given the distance between the parties. While the Court realizes that there cannot be a parenting plan that pretends to give each of these parents meaningful time on a day-to-day basis, there has to be every effort made so that Husband can have as much time with the children as possible.

\*                              \*                              \*


5. The Court orders that the Husband was to pay unto the Wife the sum of $42,500.00 in cash for her interest in the remaining assets of the marriage and for various and other sundry items stipulated between the parties and filed with the Court on September 14, 2009 and enumerated to the Court on April 27, 2010. This cash payment to the Wife was due and payable by the end of September, 2009. At that time, the Husband had paid $2,500.00. The remaining balance of $40,000.00 accrued interest at 10% per annum beginning October 1, 2009. The Husband paid an additional $5,000.00 on this judgment on January 27, 2010, for which he will be given credit on the full judgment, with interest, as of the date of that payment. The remaining balance will continue to accrue interest at 10% per annum until paid in full by Husband. Additionally, the Husband will not be given credit against this judgment for any mortgage payments he made after September 28, 2009 and the remaining balance of $35,000.00 will continue to accrue interest at 10% per annum.

      \*                        \*                       \*

> 9. That the Court approved the attorneys' fees of the Wife's counsel as requested and awards a judgment to the Wife for [$]16,620.00 in attorneys' fees for which execution may issue.

The memorandum of understanding, which the parties entered following their July 28, 2009 mediation, was attached to the trial court's order and was incorporated by reference therein. The memorandum of understanding provides, in relevant part, as follows:

> 1. The Wife shall receive all interest in the [marital residence], for which she will be financially responsible. She shall refinance the mortgage or sell the house within three years of the entry of the Final Decree of Divorce. As long as the Husband is responsible on the mortgage, he shall have access to the mortgage account, and if the mortgage becomes over sixty days in arrears, he may make the delinquent payments, conditioned on the house being immediately listed for sale, and that he will be reimbursed from the proceeds of the sale for any payments that he makes.

> 2. The Husband shall receive either the IRA or the Thrift Savings Plan ["TSP"] that is closest to the face balance of $36,000.00, as of the date of this agreement. This is to equalize equity in the marital residence.

> 3. The Wife will receive twenty-five percent of the Husband's military retirement pension, based on a Major (04) with twenty years of service at retirement. The Wife shall not receive any disability that does not offset retirement, such as combat related disability.

> 4. The remaining retirement account not used to offset equity in the house (IRA or TSP) shall be divided equally by Qualified Domestic Relations Order.

In paragraph five of the trial court's order, *supra*, Judge Gasaway refers to a stipulation reached by the parties and filed with the court on September 14, 2009. There is only one document in the appellate record that is titled "Stipulation." This document, which appears several times in the record, provides, in pertinent part, as follows:

1. That the parties have previously agreed to divide the marital estate, pursuant to the Mediation Agreement;

2. In addition to receiving the marital home, two (2) vehicles, and other items in the mediation agreement, the parties further agree that the WIFE shall receive $42,500.00 as her share of the remaining assets, of which $2,500 has been paid.

As noted above, there is some dispute in the record concerning this "Stipulation." Specifically, there is no file stamp on this document. Moreover, the "Stipulation" is not made an addendum to the trial court's order. The question, then, is whether the "Stipulation" should be considered part of this appellate record. From our review of the entire record, there is no other document that could be considered a stipulation between the parties other than that titled "Stipulation." This document is signed by the attorneys for both parties, but the Certificate of Service is not dated by the certifying attorney. Although there is no explanation in the record as to why this document was neither stamped "filed" nor made part of the trial court's order, there is no dispute that this "Stipulation" was presented to the court on September 14, 2009. Moreover, both parties' attorneys repeatedly allude to this document in the transcript of the April 27, 2010 hearing. The better practice would have been for this document to have been properly entered into the record via file stamp, or for the trial court to have incorporated and attached it to its order. However, for the limited purpose of our analysis, and particularly in light of the fact that the foregoing document is the only one in the record that could be construed as the stipulation referred to by the court in its order, we infer that the document titled "Stipulation," and set out above, is a valid part of the appellate record by virtue of the trial court's reference to it in its order.

On June 25, 2010, Mr. Irvin filed a motion to alter or amend the decree, requesting that, pursuant to Tennessee Rules of Civil Procedure 59 and 52.02 and "newly discovered evidence," the trial court amend the decree to name Mr. Irvin as the children's primary residential parent. Specifically, Mr. Irvin asserted that Ms. Irvin's actions in obtaining the *ex parte* order of protection, in the general sessions court, showed that the trial court had erred in allegedly ignoring her previous attempts to obstruct Mr. Irvin's relationship with the children and had further erred in finding that Ms. Irvin would facilitate and encourage a close and continuing relationship between Mr. Irvin and the children. Ms. Irvin opposed the motion. By order of July 29, 2010, the trial court denied Mr. Irvin's motion. Mr. Irvin appeals and raises five issues for review as stated in his brief:

1. Whether the trial court erred in its enforcement of the mediation agreement dividing the remaining retirement accounts, when it ruled that all of the remaining payment should

be in cash, contrary to the agreement's specific reference that such payment should be made using a Qualified Domestic Relations Order?

2. Where the record showed that Ms. Irvin became more than 60 days in arrears on mortgage payments, and the mediation agreement required the marital home should be immediately listed for sale, did the trial court err by not enforcing the mediation agreement?

3. Whether the evidence preponderates against the trial court's designation of Ms. Irvin as the primary residential parent for the parties' two children, where Ms. Irvin made false allegations of child abuse and violence against Mr. Irvin, showing that she was not able to foster a relationship between the children and their father, and other factors showed it was in the child[ren]'s best interest to be primarily parented by their father?

4. Whether the evidence preponderates against the trial court's finding of inappropriate marital conduct against Mr. Irvin?

5. Whether the trial court abused its discretion by awarding attorney's fees to Ms. Irvin?

Mr. Irvin has appealed the judgment of the trial court pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure. Although neither party raised the issue of whether the order appealed is a final judgment, we are required to review the record *sua sponte* to determine whether we have jurisdiction to adjudicate this appeal. *See, e.g.,* **State ex rel Garrison v. Scobey**, No. W2007–02367–COA–R3–JV, 2008 WL 4648359, at *4 (Tenn. Ct. App. Oct. 22, 2008) (*no perm. app. filed*); Tenn. R. App. P. 13(b). Tennessee Rule of Appellate Procedure 3(a) provides:

> (a) Availability of Appeal as of Right in Civil Actions. In civil actions every final judgment entered by a trial court from which an appeal lies to the Supreme Court or Court of Appeals is appealable as of right. Except as otherwise permitted in Rule 9 and in Rule 54.02 Tennessee Rules of Civil Procedure, if multiple parties or multiple claims for relief are involved in an action, any order that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties is not

-10-

enforceable or appealable and is subject to revision at any time before entry of a final judgment adjudicating all the claims, rights, and liabilities of all parties.

Under certain circumstances, a judgment which adjudicates fewer than all of the claims asserted by the parties may be made final and appealable pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure. In order to enter judgment under Rule 54.02, however, the trial court must make an explicit finding that there is "no just reason for delay" and must expressly direct that a final judgment be entered. Tenn. R. Civ. P. 54.02. An order is not properly made final pursuant to Rule 54.02 unless it disposes of an entire claim or is dispositive with respect to a party.[3] *Bayberry Assocs. v. Jones*, 783 S.W.2d 553, 558 (Tenn. 1990). In the absence of an order meeting the requirements of Rule 54.02, any trial court order that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties is not final or appealable as of right. *Id*.

In his second issue, Mr. Irvin asks this Court to order the sale of the former marital residence based upon "facts" stated in his affidavit, which was attached as Exhibit B to his motion to enforce mediation. Although Mr. Irvin's motion was filed on March 26, 2010, and was heard and denied from the bench on both April 5 and April 27, 2010, there is no written order reflecting the trial court's denial of Mr. Irvin's request to order the marital residence sold.

Tennessee Rule of Civil Procedure 3 limits the jurisdiction of this Court to hear appeals. Specifically, this Court only has jurisdiction over appeals by right from final judgments entered in the trial court. Tenn. R. App. P. 3(a). Because there is no order in the record to indicate that the trial court, in fact, ruled on the question of whether the marital residence should be sold, Mr. Irvin asks this Court to rule in his favor based only upon the transcript. It is well settled that a court speaks through its orders. *Palmer v. Palmer*, 562 S.W.2d at 837. In *Cunningham v. Cunningham*, No. W2006-02685-COA-R3-CV, 2008

---

[3] We recently have noted that, even if a trial court's order includes the necessary language from Rule 54.02, a final judgment pursuant to the rule is not appropriate unless it disposes of a claim or party. We stated, "[a] 'claim' denotes 'the aggregate of operative facts which give rise to a right enforceable in the courts.'" *Chook v. Jones*, No. W2008–02276–COA–R3–CV, 2010 WL 960319, at *3 (Tenn. Ct. App. Mar. 17, 20 10) (quoting *Christus Gardens, Inc. v. Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.*, No. M2007–01104–COA–R3–CV, 2008 WL 3833613, at *5 (Tenn. Ct. App. Aug.15, 2008), *no perm. app. filed* (quoting *McIntyre v. First Nat'l Bank of Cincinnati*, 585 F.2d 190, 191 (6th Cir.1978))). Accordingly, "'a complaint asserting only one legal right, even if seeking multiple remedies for the alleged violation of that right, states a single claim for relief.'" *Id.* (citing *Id.* (quoting *Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 744, 96 S. Ct. 1202, 47 L. Ed.2d 435 (1976))).

WL 2521425 (Tenn. Ct. App. June 25, 2008), this Court explained:

> A judgment must be reduced to writing in order to be valid. It is inchoate, and has no force whatever, until it has been reduced to writing and entered on the minutes of the court, and is completely within the power of the judge or Chancellor. A judge may modify, reverse, or make any other change in his judgment that he may deem proper, until it is entered on the minutes, and he may then change, modify, vacate or amend it during that term, unless the term continues longer than thirty days after the entry of the judgment, and then until the end of the thirty days.

*Cunningham*, 2008 WL 2521425, at *5 (citing *Broadway Motor Co., Inc. v. Fire Ins. Co.*, 12 Tenn. App. 278, 280 (1930)). Consequently, "[w]e do not review the court's oral statements, unless incorporated in a decree, but review the court's order and judgments for that is how a court speaks." *Id*. Because there is no order, not only is there no basis in the record from which this Court could determine the grounds for the trial court's decision, but this Court also lacks jurisdiction for want of a final order. Tenn. R. App. P. 3(a). Because the trial court has failed to adjudicate all of the claims, and has otherwise failed to comply with Tennessee Rule of Civil Procedure 54.02, we conclude that the order appealed is not final and consequently fails to confer jurisdiction on this Court under Tennessee Rule of Appellate Procedure 3.

Our normal course, upon a finding that the order appealed is not final, is to dismiss the appeal or to ask the appellant to show cause why we should not dismiss his or her appeal. Although we lack jurisdiction in this case to adjudicate the issues raised, in the interest of providing an efficient and cost effective avenue for meaningful and proper review by this Court should the appeal be re-filed, we feel compelled to discuss the deficiencies in the trial court's order so that they may be addressed upon remand.

The procedural problems in this record are myriad; however, the most significant shortcomings are two-fold. First, the trial court's order is ambiguous. Second, the order fails to make specific findings as required under Tennessee Rule of Civil Procedure 52.01. In order to demonstrate these defects, we will take the unusual course of discussing some of Mr. Irvin's issues to assist the trial court on remand. However, based upon our lack of jurisdiction, we cannot adjudicate these matters.

**Ambiguities in the Trial Court's Order**

Mr. Irvin asserts as his first issue that the trial court erred in not entering a Qualified

Domestic Relations Order ("QDRO") as provided for in paragraph four of the memorandum of understanding, which memorandum was incorporated into the trial court's order. *See* paragraph four of the court's order. Mr. Irvin couches his argument as a contract issue, i.e., the court did not properly enforce the memorandum of understanding between the parties. In her brief, Ms. Irvin contends that this is not an issue that sounds in contract; rather, she argues that this issue is one that questions the trial court's division of marital property. However, in the current state of the record, the distinction between contract and division of marital property is not ultimately dispositive. Rather, the resolution of this issue requires a firm grasp and understanding of what, exactly, the $42,500.00 award encompasses.

As set out in full context above, the memorandum of understanding specifically states that any remaining retirement account funds will be divided equally by a QDRO. Despite adopting the memorandum of understanding as part of its order, there is no QDRO in this record. Rather, the trial court orders that Mr. Irvin shall pay to Ms. Irvin the sum of $42,500.00 in cash "for her interest in the remaining assets of the marriage and for various and other sundry items stipulated between the parties and filed with the Court on September 14, 2009." Having determined, for the limited purpose of our analysis, that the "Stipulation" is properly before this Court, it provides only that, in addition to those items specifically enumerated in the memorandum of understanding, Ms. Irvin "shall receive $42,500.00 as her share of the remaining assets." Consequently, the problem with the trial court's order, the memorandum of understanding, and the stipulation is that it is not clear from any of these documents what, exactly, the $42,500.00 encompasses. If, as Mr. Irvin argues, it is in satisfaction of the division of the retirement accounts by adopting the memorandum of understanding (without apparent modification, but see below) as its order, the court should have entered a QDRO.[4] However, if the $42,500.00 is comprised of "various and other sundry items" and/or "remaining assets," which do not include retirement accounts, then the award presents a question of whether the court made a reasonable division of the marital property, and specifically whether the court erred in fashioning the award as a cash payment.

Although "[i]t is well settled that a trial court speaks through its orders," ***Palmer v. Palmer***, 562 S.W.2d 833, 837 (Tenn. Ct. App. 1997); *see also **In re Adoption of E.N.R.***, 42 S.W.3d 26, 31 (Tenn. 2001) ("[T]he court speaks through its order, not through the

---

[4] We note that, from the record, it appears that neither party presented a proposed QDRO to the trial court in this case. "Typically, in Tennessee, a proposed QDRO is prepared by the parties' attorneys and submitted to the trial court for approval and entry." ***Jordan v. Jordan***, 147 S.W.3d 255, 259 (Tenn. Ct. App. 2005). The better practice would have been for Mr. Irvin to present, with his March 20, 2010 motion to enforce the parties' mediation agreement, a proposed QDRO pertaining to the division of the retirement accounts. The fact that no QDRO was filed, however, does not, *ipso facto*, constitute a waiver of this issue on appeal because such an order "c[an] be entered at any time after judgment." ***Id.*** (quoting ***Murphy v. Murphy***, No. 283727, 1995 WL 749598, *2 (Conn. Super. Ct. Dec. 1, 1995)).

transcript."), this maxim does not preclude this Court from reviewing a trial court's statements from the bench, nor does it preclude us from considering any other portion of the record in determining the exact nature of a trial court's ruling. *See, e.g.*, ***Steppach v. Thomas***, No. W2010–00606–COA–R3–CV, 2011 WL 683932, *28 (Tenn. Ct. App. Feb. 28, 2011). As noted above, the gravamen of the issue of whether the trial court erred in not entering a QDRO is whether the $42,500.00 encompasses a division of the retirement accounts, or whether this amount is comprised of other marital assets not including retirement accounts. The trial court's order does not answer this question. Rather, it creates an ambiguity concerning the award of the lump sum payment of $42,500.00.

Under one logical interpretation of the court's order, we could conclude that the $42,500.00 award does not include the retirement accounts. Because the order incorporates the memorandum of understanding in paragraph four, and then goes on to award the $42,500.00 in a separate paragraph (i.e., paragraph five), it would appear that any division of property contained in paragraph five is not also contemplated in the memorandum of understanding. Moreover, the language used by the court to describe the purpose of the $42,500.00, i.e., "interest in the remaining assets of the marriage and for various and other sundry items," supports an interpretation that paragraph five of the order does not include the retirement accounts that are settled in the memorandum of understanding.

On the other hand, we could logically conclude that the court's award of $42,500.00 does include the retirement accounts. The memorandum of understanding states that the "**remaining retirement account** not used to offset equity in the house (IRA or TSP) shall be divided equally by Qualified Domestic Relations Order." (Emphasis added). The trial court's use of "remaining assets," in paragraph five of its order (*supra*), to describe the $42,500.00 could logically be construed to refer to the remaining retirement account referenced in the memorandum of understanding. Under this interpretation, the $42,500.00, or at least a portion thereof, would refer to the retirement account (i.e., either the IRA or the TSP), which would comprise (at least a portion of) the "remaining assets" of the marital estate.

The fact that the first paragraph of the memorandum of understanding specifically states that the parties were only "able to reach a partial agreement as to the division of property" only functions to further confuse the matter. Moreover, the statement in the "Stipulation" that Ms. Irvin is to receive "$42,500.00 as her share of the remaining assets," does not clarify whether this $42,500.00 includes any portion of the retirement accounts. Instead, the "Stipulation" further complicates the question. If we interpret the stipulated statement to include the retirement accounts, this interpretation would seem to be in direct contravention of the court's specific adoption of the memorandum of understanding, which contemplates entry of a QDRO, as opposed to a lump sum payment, on the retirement

accounts. On the other hand, because the "Stipulation" was not presented to the court until September 14, 2009, which was after the July 28, 2009 memorandum of understanding was reached, the "Stipulation" could be interpreted to be a modification of the memorandum of understanding, wherein the parties stipulate to set aside the QDRO requirement in favor of a lump sum payment. Paragraph five of the court's order could then be construed as an adoption of the parties' stipulation, and paragraph four of the order could be understood to be the court's adoption of the memorandum as modified by the stipulation.

We do not wish to tax the length of this opinion with all of the permutations and possible interpretations of the court's order, the memorandum of understanding, and the "Stipulation," and specifically how these documents fit together to form the trial court's decision. Suffice to say that this task would be pure supposition based upon the ambiguities created among and between these three documents. This is a problem that the trial court seems to acknowledge in its statements from the bench following the April hearing:

> You can take that mediation agreement and you can take that stipulation and you still can't tell me what they agreed to. You can tell me your interpretation of it. You can tell me what you think they meant to do. You can tell me how you think they should have gone about it and what the wisest course would have been. But you can't tell me what they agreed to in terms of the $42,500. And the reason you can't is because nobody can. Other than giving me what you think and Ms. Olsen telling me what she thinks and Mr. Irvin telling me what he thinks and Ms. Irvin telling me what she thinks, nobody can give me a piece of paper that says it in clear, concise, unequivocal language as to what the parties contemplated doing.

Although the trial court acknowledged the problem, it did not resolve the apparent inconsistencies between the "Stipulation" and the memorandum of understanding in its own order. This is the first problem with the trial court's order.

**Lack of Tennessee Rule of Civil Procedure 52.01 Findings**

Tennessee Rule of Civil Procedure 52.01 requires that, "[i]n all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment." This requirement is mandatory regardless of whether a party requests these findings. The division of marital property, including its classification and valuation are findings of fact. *Woodward v. Woodward*, 240 S.W.3d 825, 828 (Tenn. Ct. App. 2007).

-15-

The trial court's order does not provide us with sufficient information to allow a thorough and meaningful review of the judgment. As set out in full context above, the trial court's order makes broad statements such as "[H]usband is guilty of inappropriate marital conduct and that in weighing his conduct against that alleged of the Wife, the Court finds that his conduct preceded and was more egregious and damaging to the marriage"; and "the Court considered the relative factors set out in T.C.A. 36-6-404 wherein the Court found that the majority of the factors listed weighed equally on the part of the Mother and Father...." However, the court does not specify what conduct, on Mr. Irvin's part, was egregious and damaging to the marriage, nor does the court specify which of the statutory factors were dispositive in its award of child custody. In short, because of this lack of specificity, we are unable to adequately review the record to determine in whose favor the evidence preponderates.

Furthermore, the record on appeal contains little to no information concerning the valuation of the marital assets. Although there are some account statements for the IRA and the TSP, there is nothing in the record to prove the exact value of these assets. Moreover, Mr. Irvin, as the Appellant, has failed to include, in his brief, a Tennessee Rule of Appellate Procedure 7 Table. Tennessee Rule of Appellate Procedure 7 provides:

> (a) In any domestic relations appeal in which either party takes issue with the classification of property or debt **or with the manner in which the trial court divided or allocated the marital property or debt**, the brief of the party raising the issue **shall** contain, in the statement of facts or in an appendix, a table in a form substantially similar to the form attached hereto. This table shall list all property and debts considered by the trial court, including: (1) all separate property, (2) all marital property, and (3) all separate and marital debts.

(Emphasis added).

In the recent case of ***Harden v. Harden***, No. M2009-01302-COA-R3-CV, 2010 WL 2612688 (Tenn. Ct. App. June 30, 2010), this Court discussed the Rule 7 Table:

> This Court has previously held where an appellant fails to comply with this rule, that appellant waives all such issues relating to the rule's requirements. This Court is under no duty to search a trial court record in order to discern the valuation of the couple's property. This Court has previously found issues involving the valuation and division of property waived for

failure to comply with Rule 7.

*Id.* at \*8 (citations omitted).

In explaining the necessity of the Rule 7 Table, we further stated:

> [I]t is essential that the parties comply with Rule 7 in order to aid this Court in reviewing the trial court's decision. The table required by Rule 7, allows this Court to easily and correctly determine the valuation and distribution of the marital estate as ordered by the trial court. Further, the Rule 7 table, allows this Court to ascertain the contentions of each party as to the correct valuations and proper distribution, as well as the evidence in the record which the party believes supports its contention. Consequently, a table, in full compliance with Rule 7, is vital as this Court must consider the entire distribution of property in order to determine whether the trial court erred. Moreover, this Court is under no duty to minutely search the record for evidence that the trial court's valuations may be incorrect or that the distribution may be improper.

*Id.*

The lack of valuation of the marital property by the trial court is, perhaps, why Mr. Irvin failed to include a Rule 7 Table in his brief. Due to the lack of specific findings of fact concerning the valuation of much of the marital property, including the IRA and the TSP, we are unable to determine whether the $42,500.00 encompasses the retirement accounts. Moreover, as discussed above, the question of whether the "Stipulation" negates the parties' prior memorandum of understanding concerning the QDRO remains.

Although Mr. Irvin has raised additional issues for our consideration, we do not reach them due to our lack of jurisdiction resulting from the absence of a final judgment.[5] Tenn.

_____

[5]We note that, among the issues Mr. Irvin seeks to raise on appeal are issues related to the Rule 59 motion that he filed seeking custody because of Ms. Irvin's attempts to alienate him from the parties' children by making false accusations of sexual abuse or threats of violence. *See Keisling v. Keisling*, 196 S.W.3d 703, 722 (Tenn. Ct. App. 2005) (false accusations of sexual abuse in a custody dispute can be a "reprehensible tool" against an ex-spouse that is "remarkable for its brutal effectiveness"). Rule 59 motions are appropriate only where a final order has been entered; in this case, as noted above, no final order was ever entered. Therefore, the matter remains in the bosom of the trial court, and the issues raised in the Rule

(continued...)

R. App. P. 3(a). Consequently, all issues are remanded to the trial court.

Ms. Irvin has asked this Court to award her attorney's fees incurred in defending this appeal. An award of appellate attorney's fees is a matter within this Court's sound discretion. *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). In considering a request for attorney's fees on appeal, we consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the appeal was taken in good faith, and any other equitable factors relevant in a given case. *Darvarmanesh v. Gharacholou*, No. M2004–00262–COA–R3–CV, 2005 WL 1684050, at * 16 (Tenn. Ct. App. July 19, 2005). Considering all of the relevant factors in this case, and in light of our rulings herein, we respectfully decline to award Ms. Irvin's attorney's fees in this appeal.

For the foregoing reasons, we dismiss the appeal and remand for further proceedings consistent with this opinion. Costs of this appeal are assessed one-half to the Appellant, Ernest J. Irvin, II, and his surety, and one-half to the Appellee, Una P. Irvin, for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE

---

[5](...continued) 59 motion can be considered by the trial court without a Rule 59 motion, until the trial court enters a final, appealable order. *See Cooper v. Tabb*, No. W2009-02271-COA-R3-CV, 2010 WL 5441971, at *9 (Tenn. Ct. App. Dec. 22, 2010), *perm. app. denied* (Tenn. May 25, 2011).