IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 1, 2021

**DARLENE CHRISTMAS MURRAY (GODSEY) v. LOUIS WADE GODSEY**

**Appeal from the General Sessions Court for Roane County**
**No. 501A      Dennis W. Humphrey, Judge**
_____

**No. E2020-00442-COA-R3-CV**
_____

This appeal arises from a post-divorce contempt action. Darlene Christmas Murray ("Wife") filed a petition for contempt in the General Sessions Court for Roane County (the "trial court") in 2015, alleging that her former husband, Louis Wade Godsey ("Husband"), should be held in contempt for failing to pay Wife retirement benefits to which she was entitled under their final decree of divorce. The trial court found Husband in contempt and awarded Wife, *inter alia*, $25,000.00 in attorney's fees as punishment. Because the evidence in the record preponderates against the trial court's finding that Husband actually and willfully violated a court order, we reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court
Reversed in Part; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which FRANK G. CLEMENT JR., P.J., M.S., and CARMA DENNIS MCGEE, J., joined.

Porsche L. Shantz, Loudon, Tennessee, for the appellant, Louis Wade Godsey.

Julianna L. Mason, Knoxville, Tennessee, for the appellee, Darlene Christmas Murray.

**OPINION**

**FACTUAL & PROCEDURAL BACKGROUND**

The parties married in 1976. Shortly thereafter, Husband joined the Navy where he served for several years before eventually joining the Federal Aviation Administration ("FAA"). As a federal employee, Husband participated in the Civil Service Retirement

System ("CSRS")[1] as well as a Thrift Savings Plan ("TSP").  In 1994, the parties were divorced by a final decree entered by the trial court.  As relevant, the final decree provides:

> [T]he defendant Louis Wade Godsey has been employed during this marriage as an employee of the Federal Government, and consequently is entitled to retirement, and the Court finds that this is [sic] marital asset and that the plaintiff Darlene Godsey shall be entitled to 1/2 of defendant's retirement benefits until the entry of this Order, and that a Qualified Domestic Relations Order shall be prepared and entered and forwarded to the respective parties reflecting this finding of fact.
>
>                \*       \*       \*
>
> IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the defendant Louis Wade Godsey be and is hereby ordered to provide information which is necessary for the preparation of a Qualified Domestic Relations Order, which includes the following: name, address, birthdate and social security number of Participant Louis Wade Godsey and alternate payee Darlene Christmas Godsey, the name and address of the Plan and the Plan Administrator.

The final decree was entered on April 21, 1994.  A leave and earnings statement from April 30, 1994 reflects that at the time of the divorce, Husband had contributed $12,232.85 to the retirement fund and $8,673.44 to the TSP.  After the divorce was final, counsel for both parties worked together on drafting the qualified domestic relations order ("QDRO") to be filed with the trial court and submitted to the Office of Personnel Management ("OPM"), which is the federal agency that administers the CSRS.  On January 13, 1995, then-counsel for Husband submitted a draft QDRO to OPM.  On April 27, 1996, OPM responded by letter stating that it does not pre-approve court orders or advise attorneys on how to draft court orders.  The letter explained, however, that orders sent to OPM must be prepared in compliance with Part 838 Title 5 of the Code of Federal Regulations, and that OPM publishes a handbook on how to draft such orders.  The letter explained how to order the handbook and that it cost $14.00.  Husband's counsel forwarded the letter from OPM to Wife's then-counsel, explaining that he believed the QDRO was sufficient and that it was unnecessary to make any changes or purchase the OPM handbook.  On March 21, 1997 the signed QDRO was entered by the trial court.  As pertinent, the QDRO required Husband to "notify the Court and the [Wife] at least sixty (60) days before his receipt of any retirement funds under the Plan."  It is unclear from the record if or when the 1997 QDRO was submitted to OPM.

---

[1] The CSRS has since been replaced by a new system called the Federal Employees Retirement System ("FERS"); it is undisputed, however, that because of when his employment began, Husband still falls under the CSRS system and is not considered a FERS employee.

Husband retired from the FAA on April 2, 2013. When Husband submitted his application for retirement and other documents to OPM, he also included a copy of the 1994 final decree of divorce. At some point after Husband's retirement, Wife reached out to Husband via Facebook and informed him that Wife had not received any payments from OPM. Husband did not respond to this message. Wife sent another message approximately a year later, to which Husband also did not respond. Husband's current wife ("Mrs. Godsey") testified at trial, however, that she spoke to Wife about the retirement on two separate occasions, and testified that she told Wife they were unsure of the problem and for Wife to contact OPM.

On or about March 19, 2014, Wife engaged new counsel to contact OPM regarding the status of Wife's benefits.[2] Wife's new attorney mailed a copy of the 1997 QDRO to OPM along with a letter inquiring about the status of Wife's portion of the retirement. The attorney sent another letter several months later after receiving no response from OPM. On March 19, 2015, OPM responded to Wife's inquiry, explaining that the 1997 order was insufficient for processing by OPM because it was a QDRO drafted under the auspices of the Employee Retirement Income Security Act ("ERISA"), and CSRS is a government-administered plan specifically exempt from ERISA. *See* 29 U.S.C. §§ 1003(b)(1), 1051; 29 U.S.C. § 1002(32). Specifically, OPM explained:

> This court order contains language that is unacceptable under section 838.302 of Title 5 of the Code of Federal Regulations. The court order is labeled as a "qualified domestic relations order" or is issued on a form for ERISA qualified domestic relations orders and does not contain the reference required for such orders under section 838.302(a)(2) of Title 5 of the Code of Federal Regulations.

> We accept amended court orders for apportionment purposes. Should you obtain an amended court order that conforms with Federal requirements in this regard, please send us a court certified copy[.]

Notwithstanding OPM's March 2015 letter, Wife's counsel prepared a new domestic relations order and sent it, unsigned, to OPM on April 2, 2015. This new order stated, in pertinent part:

> This Order is intended to be a qualified domestic relations order ("QDRO"), as that term is defined in § 206(d) of the Employee Retirement Income Security Act of 1974 ("ERISA") and § 414(p) of the Internal Revenue Code of 1986 ("Code").

---

[2] The attorney who represented Wife in the contempt proceedings below is not the attorney representing Wife on appeal.

The record does not indicate whether OPM ever responded to this correspondence. In any event, on April 13, 2015, Wife filed her first petition for contempt against Husband, alleging he was in violation of the final decree and asking that he be ordered to pay "all sums due to [Wife]," as well as Wife's attorney's fees.

A lengthy discovery dispute ensued, most of which is not germane to the issues before us. In the years after the initial petition for contempt was filed, Wife filed several amended petitions. In the operative petition, Wife requested that Husband pay "her share of his retirement benefits that [Husband] has received to date" plus prejudgment interest, that a new order dividing the retirement be entered and sent to OPM for processing, and that Wife be awarded her attorney's fees. Wife further alleged that Husband was also in contempt of the 1997 QDRO because Husband did not provide the trial court or Wife notice when he retired from the FAA in April 2013.

The trial court eventually held a hearing on April 3, 2019 at which Wife, Husband, Mrs. Godsey, and Husband's expert witness, William J. Camp, all testified. Husband testified first, the overall tenor being that while he did not dispute Wife's right to a portion of the retirement, Husband was under the impression that the final decree required those benefits to be distributed directly to Wife by OPM. Husband stated that after the divorce was final, he hired a new attorney to work with Wife's counsel on drafting the order and submitting it to OPM. Nonetheless, Husband admitted that he had always doubted whether a QDRO was the correct document to submit. Indeed, Husband testified that he told his attorney several times between 1994 and 1997 that Husband did not believe OPM would process a QDRO because QDROs are a creature of ERISA and CSRS benefits are specifically exempt from ERISA.[3] Husband testified that both his attorney and Wife's then-counsel disagreed with Husband, that they were convinced the QDRO would be sufficient, and that Husband ultimately deferred to the attorneys' advice. Husband also testified that he was unable to contact OPM and inquire about Wife's portion of the retirement due to privacy regulations, but he admitted that he never received any notification from OPM that it had divided the funds. Regarding the 1997 QDRO, Husband admitted that he signed it, but he maintained that the parties went through many drafts of the order and that he never received a copy of the final court-filed version. Husband testified that he did not realize he was required by the QDRO to inform Wife sixty days in advance of receiving any payments from OPM. Husband maintained that he did not know about this particular requirement until Wife initiated the contempt proceedings in 2015. Both Husband and Mrs. Godsey testified that when Husband filed for retirement in 2013, they obtained a copy of the final decree from the trial court clerk and forwarded it to OPM along with the rest of Husband's retirement paperwork. Overall, Husband's testimony reflected that while he had always been unsure as to whether the QDRO was correctly drafted and submitted by the parties' former counsel, Husband cooperated in getting the

---

[3] Because of Husband's position in the FAA, he testified that he has some underlying knowledge regarding OPM's procedures.

QDRO prepared and attempted to notify OPM of Wife's rights under the final decree at the time of his retirement. Husband ultimately maintained, however, that it was Wife's responsibility to apply to OPM and to ensure the paperwork was properly processed.

On the other hand, Wife took the position that it was Husband's responsibility, per the final decree, to assist her in drafting the QDRO, submitting it to OPM, and following up with OPM regarding the division of benefits. Wife explained that she was under the impression that her portion of Husband's retirement was resolved by the 1997 QDRO and that when Husband retired in 2013, Wife expected to begin receiving her share. When this did not happen, Wife reached out to Husband via two different Facebook messages. Wife stated that Husband did not respond to her but that Mrs. Godsey responded. After Wife was unsuccessful in communicating with OPM, Wife retained a new attorney, which eventually led to the contempt proceedings. Wife's overall position at the April 3, 2019 hearing was that the final decree required Husband to do more to assist Wife with getting her payments from OPM. Specifically, Wife stated, "I don't think [Husband has] done the proper paperwork. He's not filed the correct QDRO. He never really acted like he cared and, you know, give me any information on what I could do, and that's [sic] why my attempts to contact him." While Wife acknowledged that both she and Husband had counsel from 1994–1997 and that the attorneys prepared the QDRO for the parties, Wife's overall contention was that it was Husband's responsibility to ensure the order was correctly completed and processed by OPM.

Mrs. Godsey, Husband's current wife, testified briefly. Mrs. Godsey indicated that she told Wife about Husband's retirement in April 2013 and that they discussed it once again at a birthday party in June of 2013. Mrs. Godsey explained that when Husband retired, the federal government was sequestered and that Husband did not get his payments immediately. Rather, the payments did not begin until approximately September 2013. Accordingly, Mrs. Godsey maintained that there was confusion surrounding the payments for both parties and that Mrs. Godsey encouraged Wife to get in contact with OPM herself to try and resolve her issues. Mrs. Godsey admitted that Husband refused to speak with Wife and that the parties' communication typically went through Mrs. Godsey. Additionally, Mrs. Godsey acknowledged that she eventually asked Wife to quit contacting her, as she felt Wife was starting to harass Mrs. Godsey, and at that time Mrs. Godsey again informed Wife that she needed to contact OPM herself.

Finally, Husband presented the expert testimony of Mr. Camp. Mr. Camp explained that he is an attorney who specializes in helping parties and other attorneys with the division of federal retirement. Mr. Camp testified that "ERISA specifically exempts from its coverage all federal retirement plans[,]" and that "the way you handle the division of retirement assets under ERISA is worlds apart from what you do with civil service and military." In that vein, Mr. Camp testified at length regarding the tendency of OPM to reject QDROs and other state court orders containing ERISA language, inasmuch as OPM does not consider these "court orders approved for processing" ("COAP"). Mr. Camp

further testified that the problem in the instant case is not uncommon and that attorneys unfamiliar with OPM, CSRS, and the related federal regulations are often unsuccessful in submitting a COAP to OPM. He also explained that division orders are frequently rejected by OPM because the orders are inconsistent with the provisions of the final decree of divorce. Moreover, Mr. Camp testified that in his opinion, the parties' final decree itself would have been insufficient for OPM to process because it does not address the division of Husband's retirement accrued as a result of his military service, as CSRS retirement is treated differently than military retirement.

At one point during the hearing, Husband's trial counsel objected to the manner in which the case was proceeding, noting that Wife was proceeding only under a theory of contempt and that the final decree could not be modified or expanded. Specifically, counsel for Husband stated that "this is a petition for contempt. . . . when really the proper vehicle before the Court should have been an action for declaratory judgment." Counsel further stated that "if we start expanding and . . . reweighing what [Wife] got or what she didn't get . . . that's more of a modification." The trial court overruled Husband's objection and the hearing continued.

At the conclusion of the hearing, the trial court orally ruled that it was holding Husband in contempt for failing to pay Wife half of the retirement he had received up to that date, and for failing to notify Wife that he was retiring in 2013 as mandated by the QDRO. According to the trial court, Husband "stonewalled" Wife from receiving her portion of the retirement, despite the clear intention of the final decree and the QDRO being that Wife receive a share. The trial court entered findings of fact and conclusions of law on May 6, 2019, finding in relevant part:

> [T]he Court received the final testimony in this post-divorce matter on April 3, 2019, and at the conclusion of which announced its finding [Husband] in contempt, primarily due to his not having provided to nor assisted [Wife] in her receiving her share of the retirement benefits and for his failure to provide prior notification to [Wife] as required by the Final Decree of his intent to begin receiving retirement benefits. The Court further found that though the Q.D.R.O., agreed to between the parties over twenty years ago, was ineffective, the spirit of the agreement and subsequent Order of the Court was to provide one-half of such benefits to [Wife] upon [Husband's] retirement.

> \*     \*     \*

> In his testimony, [Husband] maintained he did not know if [Wife] was receiving a portion of his retirement benefits but acknowledged he had not received any notice from the O.P.M. that such disbursements were being made to her. Also, he acknowledged from conversations with her that she

was receiving nothing from the retirement plans. His testimony was to the effect that shortly after the divorce had been completed, he was knowledgeable the Q.D.R.O. would be ineffective to provide his ex-wife a portion of the retirements to which she was entitled, his even testifying that he knew at the time of the signing of the agreement, it would be defective.

\* \* \*

[T]he Court finds and, in effect, stated to [Husband] that it appeared his intentions were to utterly defeat [Wife's] claim to her portion of the retirement in question.

\* \* \*

The Court finds as punishment for contempt that suit expenses and legal fees are awarded to [Wife] in the amount of $25,000.00 and the total judgment shall include that amount as well.

The trial court entered an order incorporating its findings of fact and conclusions of law on June 24, 2019. Shortly thereafter, Husband hired new counsel who filed a timely motion to alter or amend the June 24, 2019 order, arguing that the order was unclear and left certain issues unresolved. Husband also urged that the evidence presented at the April 3, 2019 hearing did not support a finding of contempt.

On October 30, 2019, the trial court entered a perfunctory order denying Husband's motion to alter or amend. It is undisputed, however, that this order was never served on Husband's counsel of record. *See* Tenn. R. Civ. P. 58. As such, Husband sought relief from that order. Eventually, on March 16, 2020, the trial court entered an order titled "Order Clarifying Final Decree" (the "clarifying order"). Therein, the trial court set aside its October 30, 2019 order denying Husband's motion to alter or amend and ruled on that motion. This order purported to "clarify and implement certain language" contained in the final decree, and explained how Husband's retirement benefits should be apportioned going forward. Specifically, the trial court found that pursuant to the final decree, "[Wife] is entitled to a 23.8% Pro Rata Share of the [Husband's] retirement check from his CSRS annuity[,]" and ordered Husband to prepare and submit a COAP to OPM as soon as possible. The trial court also found that Wife was entitled to a 23.8% share of "[Husband's] CSRS annuity already received by him since his retirement from the United States Government." Addressing the arrearage due to Wife, the trial court also "expressly direct[ed] US-OPM to temporarily adjust the payment[s] to pay an additional amount to [Wife] and to decrease [Husband's] payments as necessary in order for US-OPM to pay directly to [Wife] . . . her share of [Husband's] CSRS annuity payments already paid to [Husband] since the date of his retirement." Additionally, the trial court awarded Wife

$20,465.03 as her "marital share of [Husband's TSP]," prejudgment interest, and $25,000.00 in attorney's fees "as punishment" for Husband's contempt. The trial court also ordered Husband to engage Mr. Camp to prepare a COAP, to get the Wife's approval on the COAP, and then submit same to the trial court. The clarifying order also provides that "[t]his [o]rder titled 'Order Clarifying Final Decree' shall only be [sic] final judgment within the meaning of the law upon the acceptance by the OPM as a COAP . . . [t]his [o]rder . . . shall remain an interim order until a COAP has been approved by all parties, entered by the court, and accepted by OPM."

Husband then filed an appeal. On October 27, 2020, Husband filed a motion asking this Court to suspend its finality requirement and review all issues addressed in the trial court's clarifying order, notwithstanding the fact that the order, by its own terms, remains interim. Husband urged that Wife and the trial court were attempting to thwart Husband's ability to appeal and that the clarifying order "effectively leads to these proceedings being stuck in a metaphorical purgatory between finality and interlocutory status with regard to everything but the [t]rial [c]ourt's contempt finding." Wife responded, urging that the present appeal is premature, was filed for impermissible forum-shopping purposes, and that the trial court should be allowed to see the case to completion. Husband's motion was denied on November 9, 2020 by an order providing that "there is not good reason to suspend the long-established requirements of finality for an appeal as of right in this case" and that "[t]his Court declines to address those portions of the trial court's order(s) that are not final and therefore still subject to revision."

## ISSUES

We restate and consolidate Husband's issues as follows:

1. Whether the trial court's imposed punishment for contempt violates Tennessee and federal law.

2. Whether the trial court erred in holding Husband in contempt.

Wife raises the following additional issues:

3. Whether this Court has subject matter jurisdiction over this appeal.

4. Whether Wife should be awarded attorney's fees pursuant to Tennessee Code Annotated section 27-1-122.

DISCUSSION

## I.     Subject Matter Jurisdiction

As a threshold issue, Wife challenges this Court's subject matter jurisdiction. "Subject matter jurisdiction relates to a court's authority to adjudicate a particular type of case or controversy brought before it." *In re Estate of Trigg*, 368 S.W.3d 483, 489 (Tenn. 2012) (citing *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004)). As orders and judgments entered by courts lacking subject matter jurisdiction are void, "issues regarding subject matter jurisdiction should be considered as a threshold inquiry" and "resolved at the earliest possible opportunity." *Id.* (citing *Redwing v. Catholic Bishop for the Diocese of Memphis*, 363 S.W.3d 436, 445 (Tenn. 2012); *Brown v. Brown*, 281 S.W.2d 492, 497 (Tenn. 1955)). "Since a determination of whether subject matter jurisdiction exists is a question of law, our standard of review is de novo." *Chapman v. DaVita, Inc.*, 380 S.W.3d 710, 712–13 (Tenn. 2012) (quoting *Northland Ins. Co. v. State*, 33 S.W.3d 727, 729 (Tenn. 2000)).

Generally, "unless an appeal from an interlocutory order is provided by the rules or by statute, appellate courts have jurisdiction over final judgments only." *Bayberry Assocs. v. Jones*, 783 S.W.2d 553, 559 (Tenn. 1990) (citing *Aetna Cas. & Sur. Co. v. Miller*, 491 S.W.2d 85 (Tenn. 1973)); *see also* Tenn. R. App. P. 3(a). A final judgment adjudicates all "claims, rights, and liabilities of all the parties," *Discover Bank v. Morgan*, 363 S.W.3d 479, 488 n.17 (Tenn. 2012), and "resolves all the issues in the case, leaving nothing else for the trial court to do." *Id.* (quoting *In re Estate of Henderson*, 121 S.W.3d 643, 645 (Tenn. 2003)). Here, Wife avers that the order appealed from, the trial court's clarifying order, is by its terms interim and therefore cannot be reviewed by this Court. In support, Wife notes that the order itself provides it is not final until a COAP is submitted and approved by OPM.

Wife is correct that the clarifying order states that it is nonfinal until the completion of a COAP. Nonetheless, as we explained in our November 9, 2020 order, our review of this case is limited to issues that are final, namely, the finding of contempt. It is well-settled that a "contempt proceeding is *sui generis* and is considered incidental to the case out of which it arises, and often stems from an underlying proceeding that is not complete." *Doe v. Bd. of Prof'l Resp. of Supreme Court of Tenn.*, 104 S.W.3d 465, 474 (Tenn. 2003) (citing *Bowdon v. Bowdon*, 278 S.W.2d 670, 672 (Tenn. 1955)). "The term 'sui generis' means '[o]f its own kind or class; unique or peculiar.'" *Stark v. Stark*, No. W2019-00650-COA-R3-CV, 2020 WL 507644, at *3 (Tenn. Ct. App. Jan. 31, 2020) (quoting *Black's Law Dictionary* (11th ed. 2019)). Consequently, a "contempt proceeding may be 'related to the underlying case but independent from it.'" *Id.* (quoting *Ballard v. Cayabas*, No. W2016-01913-COA-R3-CV, 2017 WL 2471090, at *2 (Tenn. Ct. App. June 8, 2017)). Appeals from a finding of contempt must be made within thirty days of the court's ruling on contempt. *Blakney v. White*, No. W2018-00640-COA-R3-CV, 2019 WL 4942436, at *4

(Tenn. Ct. App. Oct. 8, 2019). However, while "[a] judgment of contempt fixing punishment is a final judgment from which an appeal will lie. . . . [a] judgment of contempt without the designation of punishment is not a final appealable judgment." *Hall v. Hall*, 772 S.W.2d 432, 436 (Tenn. Ct. App. 1989) (citations omitted).

Consequently, the salient question here is whether the trial court's order "included a designation of punishment sufficient to render the order" final. *Fletcher v. Fletcher*, No. W2003-00715-COA-R3-CV, 2004 WL 298370, at *7 (Tenn. Ct. App. Feb. 11, 2004). Resolution of this question depends upon the facts and circumstances of the particular case and the language of the trial court's order. *See, e.g.*, *Varney v. Stooksbury*, No. E2018-01812-COA-R3-JV, 2020 WL 2950555, at *3 (Tenn. Ct. App. June 3, 2020) (order not final where respondent was found in contempt but "punishment [was] withheld pending compliance of future orders of th[e] Court"); *Blakney*, 2019 WL 4942436, at *2, 4 (order finding mother in contempt and imposing $25.00 fine and $1,500.00 of attorney's fees was final); *Fletcher*, 2004 WL 298370, at *7 (order finding husband in contempt without designating punishment was not final for purposes of appeal, but order imprisoning husband until payment of, *inter alia*, child support and alimony was final and appealable).

In the instant case, the trial court sufficiently designated Husband's punishment such that the issue of contempt is final and appealable. The trial court entered findings of fact and conclusions of law on May 6, 2019 and entered an order incorporating the same on June 24, 2019. Thereafter, Husband filed a timely motion to alter or amend this order, alleging, *inter alia*, that the evidence presented at the hearing did not support the finding of contempt. The trial court entered an order denying the motion to alter or amend on October 30, 2019, which was later set aside because it was never served on Husband's counsel. Following another hearing on January 27, 2020, the trial court finally ruled on the motion to alter or amend and ultimately found Husband in contempt. In this order, the clarifying order, the trial court ordered Husband to pay $25,000.00 in attorney's fees "as punishment for [his] contempt."

Consequently, the order appealed from contains "a designation of punishment sufficient to render the order" final. *Fletcher*, 2004 WL 298370, at *7. The trial court made clear that the punishment for contempt in this case is the $25,000.00 in attorney's fees awarded to Wife. There is nothing in the record suggesting the trial court withheld ruling on additional punishment for Husband. As such, we do not lack subject matter jurisdiction on this basis.

Wife alternatively argues that Husband's notice of appeal is untimely as it should have been filed within thirty days of the trial court's findings of fact, which were entered on May 6, 2019. We also find this contention unpersuasive. The trial court entered findings of fact and conclusions of law on May 6, 2019, but did not enter an order adjudicating Husband in contempt until June 24, 2019, after which Husband filed a timely

- 10 -

motion to alter or amend. This motion was not fully resolved until the entry of the clarifying order on March 16, 2020. Husband timely appealed from that order. Insofar as Husband filed a notice of appeal within thirty days of the trial court entering an order fully resolving the issue of contempt, both adjudication and punishment, we also do not lack subject matter jurisdiction on this basis.

## II.    Contempt

Next, Husband raises several issues regarding the trial court's authority to punish Husband for contempt. Specifically, Husband urges that the trial court lacked the authority to "attach directly by state court judgment as punishment for indirect civil contempt those funds originating from a [CSRS] annuity and federal [TSP]." Husband goes on to state that a judgment requiring Husband to pay Wife "all sums due her including a reasonable fee for her attorney [is] expressly prohibited by the federal anti-attachment provisions applicable to annuities and federal TSPs." Additionally, Husband argues that "[c]ompensatory damage awards and attorney's fee awards are only authorized remedies when a party engages in indirect civil contempt by performing an act that is forbidden by court order." Because the trial court found Husband in contempt for "fail[ing] to perform an act mandated" by the trial court, Husband argues that the trial court lacked "authority to impose as punishment . . . monetary damage awards" in favor of Wife.

Husband couches the foregoing as issues of subject matter jurisdiction; however, the essence of Husband's arguments is that the trial court's imposed punishment violates both Tennessee and federal law. Because the issues regarding punishment for contempt depend upon whether Husband was properly found to be in contempt, we turn first to that question.

"For the effectual exercise of its powers, every court is vested with the power to punish for contempt" as provided by Tennessee law. Tenn. Code Ann. § 16-1-103; *see also* Tenn. Code Ann. § 29-9-101 et seq. Our Supreme Court set forth a four-element analysis for reviewing a judgment of contempt in *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346 (Tenn. 2008). The court explained:

> Civil contempt claims based upon an alleged disobedience of a court order have four essential elements. First, the order alleged to have been violated must be "lawful." Second, the order alleged to have been violated must be clear, specific, and unambiguous. Third, the person alleged to have violated the order must have actually disobeyed or otherwise resisted the order. Fourth, the person's violation of the order must be "willful."
>
> The threshold issue in any contempt proceeding is whether the order alleged to have been violated is "lawful." . . . Naturally, the determination of whether a particular order is lawful is a question of law.

- 11 -

The second issue involves the clarity of the order alleged to have been violated. A person may not be held in civil contempt for violating an order unless the order expressly and precisely spells out the details of compliance in a way that will enable reasonable persons to know exactly what actions are required or forbidden. The order must, therefore, be clear, specific, and unambiguous.

Vague or ambiguous orders that are susceptible to more than one reasonable interpretation cannot support a finding of civil contempt. Orders need not be "full of superfluous terms and specifications adequate to counter any flight of fancy a contemner may imagine in order to declare it vague." They must, however, leave no reasonable basis for doubt regarding their meaning.

Orders alleged to have been violated should be construed using an objective standard that takes into account both the language of the order and the circumstances surrounding the issuance of the order, including the audience to whom the order is addressed. Ambiguities in an order alleged to have been violated should be interpreted in favor of the person facing the contempt charge. Determining whether an order is sufficiently free from ambiguity to be enforced in a contempt proceeding is a legal inquiry that is subject to de novo review.

The third issue focuses on whether the party facing the civil contempt charge actually violated the order. This issue is a factual one to be decided by the court without a jury. The quantum of proof needed to find that a person has actually violated a court order is a preponderance of the evidence. Thus, decisions regarding whether a person actually violated a court order should be reviewed in accordance with the standards in Tenn. R. App. P. 13(d).

The fourth issue focuses on the willfulness of the person alleged to have violated the order. The word "willfully" has been characterized as a word of many meanings whose construction depends on the context in which it appears. Most obviously, it differentiates between deliberate and unintended conduct. However, in criminal law, "willfully" connotes a culpable state of mind. In the criminal context, a willful act is one undertaken for a bad purpose.

In the context of a civil contempt proceeding under Tenn. Code Ann. § 29-2-102(3), acting willfully does not require the same standard of culpability that is required in the criminal context. . . . Determining whether the violation of a court order was willful is a factual issue that is uniquely within the province of the finder-of-fact who will be able to view the witnesses and

assess their credibility. Thus, findings regarding "willfulness" should be reviewed in accordance with the Tenn. R. App. P. 13(d) standards.

*Konvalinka*, 249 S.W.3d at 354–57 (citations and footnotes omitted). If a trial court "determines that a party has willfully violated a lawful and unambiguous order, the court may, in its discretion, hold the party in civil contempt." *Scobey v. Scobey*, No. M2016-00963-COA-R3-CV, 2017 WL 4051085, at *3 (Tenn. Ct. App. Sept. 13, 2017) (citing *Konvalinka*, 249 S.W.3d at 358).

Here, Husband was held in contempt on two bases. First, the trial court found Husband in contempt of the final decree for "stonewalling" Wife's efforts to obtain her portion of the retirement. Second, the trial court found that Husband violated the 1997 QDRO by failing to notify Wife in 2013 that he was retiring.

Turning first to the final decree of divorce, it is undisputed that this is a lawful order for purposes of contempt. *Konvalinka*, 249 S.W.3d at 355. The second element of contempt, whether the final decree is clear, specific, and unambiguous, requires us to review the salient provisions using an objective standard, considering both the language of the order and the circumstances surrounding its issuance. *Konvalinka*, 249 S.W.3d at 356. To reiterate, the final decree states that Wife is "entitled to 1/2 of [Husband's] retirement benefits until the entry of this Order, and that a [QDRO] shall be prepared and entered and forwarded to the respective parties reflecting this finding of fact." The decree further orders Husband to "provide information which is necessary for the preparation of a [QDRO]," including Husband's name, address, birthdate and social security number, and the name and address of the retirement plan administrator.

Construing the final decree "using an objective standard[,]" as we are required to, and taking into account "both the language . . . and the circumstances surrounding" its issuance, we cannot conclude that the final decree is ambiguous as to Husband's responsibilities. *Id.* at 355. Rather, the plain language reflects that Husband's duty pursuant to the final decree was to provide the necessary information for Wife to obtain an appropriate order of division. While Wife took the position at trial that Husband is required to himself divide his retirement payments and transmit half of same to Wife, this is simply not provided for in the final decree. Rather, the judgment clearly contemplates that the division and payment of the retirement funds shall be effectuated through the use of a domestic relations order submitted to the plan administrator, in this case OPM. Further, the circumstances of the final decree's issuance, which we are constrained to consider, reflect that both parties understood this to be the meaning of the final decree inasmuch as they worked together with their attorneys to complete a QDRO in 1997. The final decree is clear, specific, and unambiguous regarding Husband's responsibilities for effectuating the division of his retirement.

The next element of civil contempt is whether Husband "actually violated" the final decree, which is a question of fact to be decided by the court. *Id.* at 356. We review this finding de novo, presuming it correct unless the preponderance of the evidence is otherwise. *Id.*; Tenn. R. App. P. 13(d). As to this element, the trial court on several occasions stated that Husband "stonewalled" Wife's efforts to obtain her portion of the retirement and on this basis held Husband in contempt. The trial court took particular issue with Husband failing to answer Wife's Facebook messages, stating that Husband "stonewalled her on communications" and had Mrs. Godsey speak to Wife instead. The trial court also explained that it found Husband in contempt because Husband knew the 1997 QDRO would not be accepted by OPM and failed to take any action. According to the trial court, Husband's "intentions were to utterly defeat [Wife's] claim to her portion" of the retirement.

The record preponderates against the trial court's findings. After the parties divorced, Husband hired a new attorney to draft a division order to submit to OPM. When Husband realized that this attorney, as well as Wife's then-attorney, were drafting a QDRO that might be rejected by OPM, Husband attempted to tell the attorneys of their mistake. Most unfortunately, letters between those attorneys, which are contained in the record, show that Husband was ignored. While the trial court found that part of Husband "stonewalling" Wife was Husband's knowledge that a QDRO might be insufficient for OPM processing, to punish Husband on this basis penalizes him for heeding the advice of his counsel, as well as Wife's own counsel.

The record establishes that the information Husband was required to provide under the final decree was provided and that Husband cooperated in executing the QDRO. Additionally, when Husband retired from the FAA in 2013, he and Mrs. Godsey obtained a copy of the final decree and forwarded it to OPM. Accordingly, Husband not only fulfilled his requirements under the final decree but took additional steps to notify OPM of Wife's interest in his retirement. Contrary to the trial court's findings, the final decree simply does not require Husband to make Herculean efforts on Wife's behalf to ensure a division order is processed by OPM. Indeed, the relevant federal regulations reflect that when CSRS funds are to be divided by virtue of a state court order, "the former spouse (personally or through a representative) must apply in writing." 5 C.F.R. § 838.1005(a).[4]

The record reveals that in this case, Wife's troubles stem not from Husband's "stonewalling," but rather from the failure of counsel to draft a COAP, rather than a QDRO, in compliance with the pertinent federal laws and regulations. *See Pruitt v. Pruitt*, 293 S.W.3d 537, 543 n.8 (Tenn. Ct. App. 2008) (noting that QDROs are "creatures of [ERISA]" and address *private* pension plans) (emphasis added); *see also* 29 U.S.C. § 1056(d) (addressing QDROs); 29 U.S.C. §§ 1003(b)(1), 1051; 29 U.S.C. § 1002(32)

---

[4] According to Mr. Camp, Husband would have been unable to contact or negotiate with OPM on Wife's behalf even if he attempted to do so.

(exempting governmental plans from ERISA coverage). Inasmuch as the final decree requires Husband to provide the necessary information for the drafting of a domestic relations order dividing Husband's retirement, and Husband has long-since provided such information, the record preponderates against the trial court's finding that Husband actually violated the final decree of divorce. Accordingly, the decision of the trial court finding Husband in contempt of the final decree is reversed.[5]

Our inquiry does not end here, however, as the trial court also found Husband in contempt of the 1997 QDRO, which provides that Husband must notify "the [trial court] and the [Wife] at least sixty (60) days before his receipt of any retirement funds under the Plan." Because Husband admitted at trial that he did not provide notice to either the trial court or the Wife regarding his receipt of any retirement funds, the trial court found Husband in contempt of the QDRO. We conclude, however, that this ruling must also be reversed because the evidence preponderates against the trial court's finding that Husband willfully violated this provision. *See Konvalinka*, 249 S.W.3d at 357.

As the QDRO is an order that was signed by the parties, entered by the trial court, and has not been set aside or vacated, it is a lawful order for purposes of contempt.[6] Additionally, the requirement that Husband provide notice of receipt of his retirement benefits to the trial court and Wife is clear and unambiguous. Husband admitted at trial that he failed to comply with this requirement, and as such Husband actually violated the trial court's order. Nonetheless, there is nothing in the record to support the trial court's finding that this omission was willful.

The word "willfully" "differentiates between deliberate and unintended conduct." *Konvalinka*, 249 S.W.3d at 357 (citing *State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Group Trust*, 209 S.W.3d 602, 612 (Tenn. Ct. App. 2006)). Here, it is undisputed that the QDRO at issue was signed by the parties in 1997, nearly sixteen years prior to Husband's retirement. Husband testified that the parties went through several drafts of the QDRO and that there was great confusion surrounding its execution; this contention is independently supported by the record, specifically by the correspondence between the parties' former attorneys. Additionally, Husband admitted to signing the 1997 QDRO but testified that he was never given his own copy. Wife argues on appeal that a party is not excused from compliance with a written agreement by failing to read said agreement. As we have already explained, however, the QDRO is not invalid nor does our decision today mean that Husband was wholly exempt from complying with it; rather, we simply

---

[5] To the extent Wife requires additional information from Husband in order to have a proper COAP drafted, Husband is constrained to provide it pursuant to the final decree.

[6] Husband argues on appeal that the QDRO is not a lawful order because it was rejected by OPM. However, "a lawful order is one issued by a court with jurisdiction over both the subject matter of the case and the parties[,]" and an order is not unlawful "simply because it is erroneous or subject to reversal on appeal." *Konvalinka*, 249 S.W.3d at 356 (citations omitted). We are therefore unpersuaded that the QDRO is unlawful for purposes of contempt because it was drafted incorrectly for processing by OPM.

conclude that the record preponderates against the finding that Husband's noncompliance with the notice provision of the QDRO was deliberate. The fact that Husband sent OPM a copy of the final decree of divorce upon his retirement further undercuts the finding that Husband intentionally failed to give Wife notice of his retirement in order to prevent her from receiving her portion.

A conclusion that Husband's omission was intentional, rather than an inadvertent oversight, is sheer speculation. *See Flowers*, 209 S.W.3d at 612 ("Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent."). Because the record preponderates against the trial court's finding that Husband willfully violated the 1997 QDRO, this ruling is also reversed.

"A finding of willful conduct must precede a judgment for contempt." *Reeder v. Reeder*, 375 S.W.3d 268, 280 (Tenn. Ct. App. 2012), *perm. app. denied* (Tenn. June 20, 2012) (quoting *Haynes v. Haynes*, 904 S.W.2d 118, 120 (Tenn. Ct. App. 1995)). As such, Husband's arguments regarding the trial court's authority to punish him for contempt are pretermitted.

To be clear, our conclusion today is limited to the finding of contempt itself and the $25,000.00 in attorney's fees awarded to Wife as punishment for the contempt. Accordingly, and in keeping with our November 9, 2020 order, we make no ruling on the other issues Husband seeks to raise. The finding of contempt as to Husband is reversed, as is the award of attorney's fees rendered as punishment for contempt.

## III. Attorney's fees

Finally, Wife asserts that this appeal is frivolous and asks to be awarded her attorney's fees pursuant to Tennessee Code Annotated section 27-1-122. The law on frivolous appeals is well-settled:

> Parties should not be forced to bear the cost and vexation of baseless appeals. *Davis v. Gulf Ins. Group*, 546 S.W.2d 583, 586 (Tenn. 1977); *Jackson v. Aldridge*, 6 S.W.3d 501, 504 (Tenn. Ct. App. 1999); *McDonald v. Onoh*, 772 S.W.2d 913, 914 (Tenn. Ct. App. 1989). Accordingly, in 1975, the Tennessee General Assembly enacted Tenn. Code Ann. § 27-1-122 to enable appellate courts to award damages against parties whose appeals are frivolous or are brought solely for the purpose of delay. Determining whether to award these damages is a discretionary decision. *Banks v. St. Francis Hosp.*, 697 S.W.2d 340, 343 (Tenn. 1985). A frivolous appeal is one that is devoid of merit, *Combustion Eng'g, Inc. v. Kennedy*, 562 S.W.2d 202, 205 (Tenn. 1978), or one that has no reasonable chance of succeeding. *Davis v. Gulf Ins. Group*, 546 S.W.2d at 586; *Jackson v. Aldridge*, 6 S.W.3d at 504; *Industrial Dev. Bd. v. Hancock*, 901 S.W.2d

382, 385 (Tenn. Ct. App. 1995).

*Young v. Barrow*, 130 S.W.3d 59, 66–67 (Tenn. Ct. App. 2003).  Given that Husband has prevailed on the issue of contempt, we decline to award Wife her attorney's fees.

## CONCLUSION

The judgment of the trial court is reversed in part, and this matter is remanded for further proceedings consistent with this opinion.  Costs of this appeal are taxed to the appellee, Darlene Christmas Murray.

_____
KRISTI M. DAVIS, JUDGE